[No. C063012. Third Dist. Aug. 9, 2011.]

THE PEOPLE, Plaintiff and Respondent, v.
ARTHUR JAMES BATTLE III, Defendant and Appellant.

[No. C063013. Third Dist. Aug. 9, 2011.]

THE PEOPLE, Plaintiff and Respondent, v.
ISAIAH DUPREE BARRON, Defendant and Appellant.

[No. C063596. Third Dist. Aug. 9, 2011.]

THE PEOPLE, Plaintiff and Respondent, v.
VARDAN ABRAMYAN, Defendant and Appellant.

54

## COUNSEL

Jeffrey S. Kross, under appointment by the Court of Appeal, for Defendant and Appellant Arthur James Battle III.

Richard A. Levy, under appointment by the Court of Appeal, for Defendant and Appellant Isaiah Dupree Barron.

Scott Concklin, under appointment by the Court of Appeal, for Defendant and Appellant Vardan Abramyan.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Stephen G. Herndon, Julie A. Hokans, Darren K. Indermill and Jeffrey A. White, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**NICHOLSON, J.**—Norik Abramyan (Norik) was shot and killed by two assailants as he sat in his car in the parking lot of a Hollywood Video store. The two assailants, defendant Arthur James Battle III and Jason Dillingham, the latter not involved in this proceeding, were hired by defendant Isaiah Dupree Barron, who was hired by Norik's son, defendant Vardan Abramyan (Abramyan), to commit the murder. Convicted by separate juries of conspiracy to commit murder and murder with special circumstances, the three defendants appeal. We consolidated the appeals for argument and decision only.

As to each defendant, we strike the parole revocation fine imposed and suspended pursuant to Penal Code section 1202.45. Imposition of the fines was improper because each defendant was sentenced to an indeterminate term of life without parole.

Except for their contentions concerning the parole revocation fines, defendants' contentions on appeal reveal no prejudicial error. We therefore modify each judgment and affirm.

### FACTS[1]

Abramyan approached Barron, an acquaintance, about killing Norik. He agreed to pay Barron $4,000 for the killing and, a few days before the killing, gave Barron $200. The evening before the killing, Abramyan gave Barron an additional $1,800. Abramyan asked Barron if Barron was going to commit the killing alone, and Barron replied, "Don't worry about it."

Barron recruited Battle and Dillingham to assist him in killing Norik. He offered, and eventually paid, each of them $500.

---

[1] These facts are taken from evidence presented to all three juries. Additional facts relevant to individual defendants are recounted later.

On July 30, 2006, Lawrence Stringer accompanied Barron, Battle, and Dillingham to a liquor store. Barron told Stringer that they were going to kill someone for money. Stringer said that he did not want to be involved. Barron, Battle, and Dillingham each had a handgun.

The car, carrying Barron, Battle, Dillingham, and Stringer, stopped at an apartment complex. All but Stringer left the car and walked into the complex where they met with Abramyan. A short time later, Barron, Battle, and Dillingham returned to the car. Norik drove up and walked into the complex. Barron, Battle, and Dillingham followed on foot, but they soon came running back to the car and said that they had not shot Norik because there were other people around.

Abramyan called Barron by cell phone, and they agreed to meet at the Hollywood Video store where Abramyan would bring Norik. Barron, Battle, Dillingham, and Stringer drove to the Hollywood Video store and parked behind the store. Barron, Battle, and Dillingham agreed that Battle and Dillingham would do the shooting and Barron would be the driver.

Abramyan and Norik arrived at Hollywood Video in a white Kia and went into the store. After a while, they returned to the car, but Abramyan told Norik that he had to go back into the store to use the restroom. Abramyan again returned to the car but went back into the store, telling Norik he left his cell phone in the restroom.

Meanwhile, Battle and Dillingham walked around to the front of the store, while Barron and Stringer waited in the car behind the store. After waiting for a while, Barron drove around to the front of the store. He spoke to Battle and Dillingham, who were smoking cigars, and encouraged them to shoot Norik. Barron then drove back behind the store to wait. After a few more minutes, Barron told Stringer to go get Battle and Dillingham because, in Stringer's words, "they weren't going to do it." Stringer got out of the car, but before he could walk around the car he heard gunshots.

Battle and Dillingham had waited in the parking lot for a total of about 30 minutes, anxious and pacing, with gloves on and bandanas around their necks. When Norik was alone in the car, Battle and Dillingham put the bandanas up over the lower part of their faces, drew handguns, and ran toward the car, with Dillingham ahead of Battle. They stopped next to the car, on the driver's side, and shot at Norik. Battle and Dillingham then returned to the car driven by Barron, and they sped away.

Norik died at the scene.

After the murder, Abramyan arranged to have the last $2,000 delivered to Barron.

## PROCEDURE

The district attorney filed an amended information charging Battle, Barron, and Abramyan with conspiracy to commit murder (count one; Pen. Code, §§ 182, subd. (a)(1), 187, subd. (a)) and murder with financial-gain and lying-in-wait special circumstances (count two; Pen. Code, §§ 187, subd. (a), 190.2, subd. (a)(1) & (15)). As to each count, it was further alleged that Battle personally discharged a firearm causing death (Pen. Code, § 12022.53, subd. (d)) and Barron and Abramyan were involved in an offense in which a principal was armed (Pen. Code, § 12022, subd. (a)(1)).

Battle, Barron, and Abramyan were tried jointly, but each had a separate jury. The juries found each defendant guilty on both counts and found all enhancement and special circumstance allegations true.[2]

The trial court sentenced Battle to an indeterminate term of life without possibility of parole on count two, with an additional 25 years to life for personally discharging a firearm causing death. On count one, the court imposed an indeterminate term of 25 years to life, with an additional 25 years to life for personally discharging a firearm causing death. The sentence on count one was stayed pursuant to Penal Code section 654.

The trial court sentenced Barron to life without possibility of parole on count two, with an additional year for the arming of a principal. On count one, the court imposed an indeterminate term of 25 years to life, with an additional year for the arming of a principal. The sentence on count one was stayed pursuant to Penal Code section 654.

The trial court sentenced Abramyan to life without possibility of parole on count two, with an additional year for the arming of a principal. On count one, the court imposed an indeterminate term of 25 years to life, with an additional year for the arming of a principal. The sentence on count one was stayed pursuant to Penal Code section 654.

---

[2] Jason Dillingham was tried and convicted separately of first degree murder with special circumstances and an enhancement for personal discharge of a firearm causing death. This court affirmed his conviction. (*People v. Dillingham* (Aug. 19, 2009, C058682) [nonpub. opn.].)

DISCUSSION

I

*Battle's Contentions*

A. *Peremptory Challenge of Juror*

During selection of Battle's jury, the prosecution used a peremptory challenge to excuse an African-American juror. Counsel for Battle made a motion pursuant to *People v. Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748] (*Wheeler*) (see also *Batson v. Kentucky* (1986) 476 U.S. 79 [90 L.Ed.2d 69, 106 S.Ct. 1712] (*Batson*)), essentially asserting that the prosecution's use of the peremptory challenge violated his constitutional rights. The trial court denied the motion. Battle, who described himself at trial as "half African American," contends that the trial court erred by denying his *Wheeler* motion.

1. *Relevant Law*

■ " 'A prosecutor's use of peremptory challenges to strike prospective jurors on the basis of group bias—that is, bias against "members of an identifiable group distinguished on racial, religious, ethnic, or similar grounds"—violates the right of a criminal defendant to trial by a jury drawn from a representative cross-section of the community under article I, section 16 of the California Constitution. [Citations.] Such a practice also violates the defendant's right to equal protection under the Fourteenth Amendment to the United States Constitution. [Citations.]' [Citation.]" (*People v. Hutchins* (2007) 147 Cal.App.4th 992, 996 [55 Cal.Rptr.3d 105].)

■ "In a recent decision, the United States Supreme Court reaffirmed that *Batson* states the procedure and standard to be employed by trial courts when challenges such as defendant's are made. 'First, the defendant must make out a prima facie case "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." [Citations.] Second, once the defendant has made out a prima facie case, the "burden shifts to the State to explain adequately the racial exclusion" by offering permissible race-neutral justifications for the strikes. [Citations.] Third, "[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination." [Citation.]' [Citation.]" (*People v. Cornwell* (2005) 37 Cal.4th 50, 66–67 [33 Cal.Rptr.3d 1, 117 P.3d 622], disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22 [87 Cal.Rptr.3d 209, 198 P.3d 11].)

"The three-step *Batson* analysis, however, is not so mechanical that the trial court must proceed through each discrete step ·in ritual fashion." (*People v. Adanandus* (2007) 157 Cal.App.4th 496, 500 [69 Cal.Rptr.3d 25].) "[W]here the ' " 'trial court denies a *Wheeler* motion without finding a prima facie case of group bias the reviewing court considers the entire record of voir dire. [Citations.] As with other findings of fact, we examine the record for evidence to support the trial court's ruling. Because *Wheeler* motions call upon trial judges' personal observations, we view their rulings with "considerable deference" on appeal. [Citations.] If the record "suggests grounds upon which the prosecutor might reasonably have challenged" the jurors in question, we affirm.' " ' [Citation.]" (*Id.* at p. 501.)

### 2. *Proceedings*

During voir dire, the court apparently asked the prospective jurors about service on prior juries. Directing its question to Prospective Juror Helena Rhodes concerning her service on a jury in 2000, the court asked what type of case it was and whether it was a criminal case. Rhodes responded that she could not remember.

The prosecution used its first peremptory challenge to excuse Prospective Juror Rhodes.

Later, outside the presence of the jury panel, Battle's defense counsel stated: "It appeared to me [Rhodes] was African American. She's the only African American that's needed. She was the very first exclusion of the prosecution so I would make—initiate a Wheeler motion."

The court responded: "I understand. And basically what she indicated was that she served on a case in 2000, knew nothing about it very well, if anything, didn't remember and she was excused by the prosecution and I accept that as an excuse based upon her lack of interest and lack of memory rather than a race based exercising challenge."

### 3. *Analysis*

Battle contends: "The court committed reversible error by failing to find [Battle] presented a prima facie case of discrimination when the prosecutor exercised his first peremptory challenge to excuse the only African-American potential juror on the panel." This contention fails because (1) the record does not support the assertion that Rhodes was the only African-American on the jury panel and (2) the proceedings did not compel the trial court to find a prima facie case of discrimination.

Battle asserts that defense counsel's statement that Rhodes was "the only African American that's needed" meant that Rhodes was the only African-American on the jury panel. We disagree. It is not clear what counsel meant. He could have meant that use of a peremptory challenge to excuse even one African-American for discriminatory purposes can support a *Wheeler* motion. In any event, the meaning that Battle assigns to the statement is not the only interpretation and, indeed, is a stretch. Therefore, the record does not support the assertion that Rhodes was the only African-American on the jury panel.

Battle further argues that he made a prima facie showing of discriminatory intent, which required the trial court to inquire of the prosecution concerning the reasons for excusing Rhodes. We disagree that Battle made a prima facie showing of discriminatory intent. This record does not reveal how many African-Americans were on the jury panel or actually served on the jury. When questioned about her prior jury service, Rhodes could not remember. As the trial court noted, her response exhibited a lack of interest and lack of memory—acceptable reasons for a peremptory challenge.

The Supreme Court's conclusion in a recent case is also apt here: "[W]e have independently reviewed the record and conclude that defendant failed to 'produc[e] evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred.' [Citation.] Defendant's showing in support of his . . . *Wheeler/Batson* motion was meager. At the hearing, defense counsel relied solely on the fact the prosecutor had exercised three of her 10 peremptory challenges to excuse two African-American prospective jurors and one Hispanic prospective juror. Such evidence, without more, is insufficient to create an inference of discrimination, especially where, as here, the number of peremptory challenges at issue is so small. [Citations.]" (*People v. Taylor* (2010) 48 Cal.4th 574, 642–643 [108 Cal.Rptr.3d 87, 229 P.3d 12].)

Battle's contention is without merit.

B. *Evidence of Intent to Kill*

Battle's convictions required a finding that he intended to kill. Battle contends he presented sufficient evidence to raise a reasonable doubt concerning whether he intended to kill the victim. This contention misstates the standard of review concerning sufficiency of evidence. We affirm unless the evidence was insufficient to establish he intended to kill the victim. Under the proper standard, Battle's contention is without merit.

"When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that

is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.]" (*People v. Lindberg* (2008) 45 Cal.4th 1, 27 [82 Cal.Rptr.3d 323, 190 P.3d 664].) We· need not be convinced beyond a reasonable doubt that Battle intended to kill Norik. "Our inquiry on appeal 'in light of the whole record [is] whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citations.] The standard of review is the same when the People rely mainly on circumstantial evidence. [Citations.]" (*People v. Sanchez* (1995) 12 Cal.4th 1, 31–32 [47 Cal.Rptr.2d 843, 906 P.2d 1129], italics omitted, disapproved on other grounds in *People v. Doolin, supra*, 45 Cal.4th at p. 421, fn. 22.)

In making his argument concerning the sufficiency of the evidence of intent to kill, Battle restricts his analysis to the evidence most favorable to himself. Such an approach is a nonstarter and, indeed, forfeits consideration of the issue. (*People v. Dougherty* (1982) 138 Cal.App.3d 278, 282 [188 Cal.Rptr. 123].)

Battle primarily cites his own statements and the testimony of his psychology expert to support his contention that the evidence was insufficient to sustain the jury's finding that he intended to kill Norik. He stated he did not want to shoot Norik but feared Barron's response if he failed to shoot, although he admitted to doing the shooting for $500. The psychologist testified that, because of a personality disorder, Battle may have been incapable of accurately assessing the situation, but the psychologist did not testify that Battle could not form the intent to kill.

A judgment challenged on appeal is presumed correct, and it is the appellant's burden to affirmatively demonstrate error. (*People v. $497,590 United States Currency* (1997) 58 Cal.App.4th 145, 152–153 [68 Cal.Rptr.2d 185].) Thus, when a criminal defendant claims insufficiency of the evidence on a particular element of the crime of which he was convicted, we presume the evidence of that element was sufficient, and the defendant bears the burden of convincing us otherwise. To do so, the defendant must present his case to us in a manner consistent with the substantial evidence standard of review. That is, the defendant must set forth in his opening brief all of the material evidence on the disputed element in the light most favorable to the prosecution, and then must persuade us that that evidence cannot reasonably support the jury's verdict. (See *People v. Dougherty, supra*, 138 Cal.App.3d at p. 282.)

Here, Battle does not follow these rules. His argument on this issue largely mirrors his own statements and argument at trial. He neglects to include all of the relevant evidence in his analysis, but instead selectively describes the circumstances most favorable to him. This approach amounts to a forfeiture.

In any event, the evidence of Battle's intent to kill is sufficient. He agreed to participate in the killing for $500. He accompanied the others on the failed mission to kill Norik at the apartment complex. He lay in wait at the Hollywood Video store. And he shot at Norik as Norik sat defenseless in the car. His self-serving statements and his expert's testimony concerning a personality disorder notwithstanding, the evidence amply supported the jury's determination that Battle intended to kill Norik.

### C. *Parole Revocation Fine*

The trial court imposed and suspended a parole revocation fine pursuant to Penal Code section 1202.45. Battle contends, and the Attorney General agrees, that imposition of the parole revocation fine was improper because he was sentenced to an indeterminate term of life without parole. We also agree and order the parole revocation fine stricken.

■ Penal Code section 1202.45 requires assessment of a parole revocation restitution fine "[i]n every case where a person is convicted of a crime and whose sentence includes a period of parole." Because Battle's sentence included no period of parole and he was sentenced to no determinate term, it was improper to impose the parole revocation fine. (See *People v. Brasure* (2008) 42 Cal.4th 1037, 1075 [71 Cal.Rptr.3d 675, 175 P.3d 632]; *People v. Oganesyan* (1999) 70 Cal.App.4th 1178, 1183 [83 Cal.Rptr.2d 157].)

## II

### *Barron's Contentions*

Some of Barron's contentions are based on his evidence and argument at trial that he changed his mind about killing Norik and tried to stop it from happening. Stringer testified that he went with Barron, Battle, and Dillingham to the Hollywood Video store. When they arrived, they parked behind the store, and Battle and Dillingham left the car, going around to the front of the store. After a few minutes, Barron, who was driving the car, decided to go check on Battle and Dillingham. He drove the car around to the front of the store and asked Battle and Dillingham what was taking so long. Barron drove the car back behind the store. After a few more minutes of waiting, Barron told Stringer to go get Battle and Dillingham because "they weren't going to do it." Stringer later testified that, as they waited behind the Hollywood Video store, Barron told him "that he [(Barron)] wasn't going to do it and that I should go get them." Stringer left the car to go get Battle and Dillingham, but before he even got around the car, he heard gunshots.

After he was arrested, Barron told an investigator, referring to when he and Stringer were in the car behind the Hollywood Video store: "I started thinking

it was no good. I told [Stringer] to go stop them. [Stringer] got out of the car, walked towards the parking lot. Before he got to the corner of the building, though, we heard the shots." Barron also claimed that he had told the others before they arrived at Hollywood Video and then again when they arrived at Hollywood Video that he no longer wanted to participate, but that they said they wanted to continue. At that point, Barron did nothing to stop what had been put in motion as Battle and Dillingham went to the front of the store to do the killing.

### A. Intent to Kill of Aider and Abettor

Barron contends that the trial court erred by not instructing the jury that the special circumstance allegations could not be found true unless the jury determined that Barron still harbored an intent to kill at the time of the killing rather than at the time he aided and abetted in the killing. Barron forfeited this contention by failing to object to the jury instructions. In any event, Barron's proposed interpretation is contrary to the language of the aiding-and-abetting special-circumstances statute and does not find support in the cases he cites.

Penal Code section 190.2 is the special circumstances statute. Subdivision (c) of section 190.2 provides for the intent-to-kill requirement for an aider and abettor, as follows: "Every person, not the actual killer, who, with the intent to kill, aids, abets, counsels, commands, induces, solicits, requests, or assists any actor in the commission of murder in the first degree shall be punished by death or imprisonment in the state prison for life without the possibility of parole if one or more of the special circumstances enumerated in subdivision (a) has been found to be true under Section 190.4."

Consistent with this subdivision, the trial court instructed Barron's jury: "If you decide that the defendant is guilty of first degree murder but was not the actual killer, then, when you consider the special circumstances of murder for hire and lying in wait, you must also decide whether the defendant acted with intent to kill. [¶] In order to prove these special circumstances for a defendant who is not the actual killer but who is guilty of first degree murder as an aider and abettor or a member of a conspiracy, the People must prove that the defendant acted with the intent to kill. [¶] . . . [¶] If the defendant was not the actual killer, then the People have the burden of proving beyond a reasonable doubt that he acted with the intent to kill for the special circumstances to be true. . . ."

■ Barron did not object to the special circumstances instructions. "Failure to object to instructional error forfeits the issue on appeal unless the error affects defendant's substantial rights. [Citations.] The question is whether the

error resulted in a miscarriage of justice under *People v. Watson* (1956) 46 Cal.2d 818 [299 P.2d 243]. [Citation.]" (*People v. Anderson* (2007) 152 Cal.App.4th 919, 927 [61 Cal.Rptr.3d 903] (*Anderson*).) We find no error, much less a miscarriage of justice.

" 'Under settled canons of statutory construction, in construing a statute we ascertain the Legislature's intent in order to effectuate the law's purpose. [Citation.] We must look to the statute's words and give them their usual and ordinary meaning. [Citation.] The statute's plain meaning controls the court's interpretation unless its words are ambiguous.' [Citation.]" (*People v. Robinson* (2010) 47 Cal.4th 1104, 1138 [104 Cal.Rptr.3d 727, 224 P.3d 55].)

The plain language of the statute leads to only one interpretation—the special circumstances statute requires that an aider and abettor have an intent to kill when he aids and abets, not necessarily when the actual killing takes place. Despite this plain language, however, Barron argues that the "framework" of the special circumstances statute, Penal Code section 190.2, provides for special circumstances liability only if the aider and abettor intended to kill at the time the killing was committed.

Subdivision (b) of Penal Code section 190.2, which relates to the actual killer only, states that "an actual killer . . . need not have had any intent to kill *at the time of the commission of the offense which is the basis of the special circumstance* in order to suffer death or confinement in the state prison for life without the possibility of parole." (Italics added.) Noting the difference in wording between subdivision (b) (concerning actual killers) and subdivision (c) of section 190.2 (concerning aiders and abettors), Barron argues: "Reading the statutory framework as a whole, and avoiding a reading that creates surplusage [citation], it is evident that the italicized modification of 'intent to kill' in subdivision (b) must carry over to the meaning of 'intent to kill' in subdivision (c) . . . ."

Barron's argument is backwards. Because the Legislature included the language "at the time of the commission of the offense" in Penal Code section 190.2, subdivision (b) but left it out of section 190.2, subdivision (c), we must presume the Legislature intended to leave it out. (*O'Grady v. Superior Court* (2006) 139 Cal.App.4th 1423, 1443 [44 Cal.Rptr.3d 72].) Therefore, the canons of statutory interpretation do not support Barron's argument.

Likewise, Barron's citation to authority fails to support his argument. In *People v. Freeman* (1994) 8 Cal.4th 450 [34 Cal.Rptr.2d 558, 882 P.2d 249], the defendant shot and killed the victim while committing a robbery. (*Id.* at p. 470.) Convicted of murder with a robbery special circumstance, the

defendant asserted on appeal that the court's instructions allowed the jury to find true the special circumstance without concluding that the defendant intended to kill the victim at the time he shot the victim. (*Id.* at p. 507.) The Supreme Court rejected the argument because the jury would not have understood the instructions to allow it to find true the special circumstance if the defendant did not intend to kill the victim when he shot him. (*Ibid.*)

*Freeman* is unhelpful to Barron. As noted, subdivision (c) of Penal Code section 190.2 requires that the aider and abettor intended to kill only at the time of the aiding and abetting, not at the time of the actual killing. *Freeman*, on the other hand, involved an actual killer, to whom subdivision (c) was inapplicable. *Freeman* is distinguishable because Barron was an aider and abettor, not the actual killer.

Barron's remaining arguments on this issue essentially urge us to ignore the plain language of the statute and, for that reason, are unconvincing. Barron's jury instruction contention is without merit.

### B. *Withdrawal Defense*

Barron asserts that the trial court erred by not instructing the jury, sua sponte, that a defendant may assert a defense of withdrawal if he attempts to notify the other participants of his withdrawal but such notification is impossible. Barron forfeited this argument by failing to object to the court's withdrawal defense instruction and, in any event, there was no error.

The trial court instructed the Barron jury concerning the withdrawal defense using CALCRIM No. 401, which states, in pertinent part:

"A person who aids and abets a crime is not guilty of that crime if he or she withdraws before the crime is committed. To withdraw, a person must do two things:

"1. He must notify everyone else he knows is involved in the commission of the crime that he is no longer participating. The notification must be made early enough to prevent the commission of the crime.

"AND

"2. He must do everything reasonably within his or her power to prevent the crime from being committed. He or she does not have to actually prevent the crime.

"The People have the burden of proving beyond a reasonable doubt that the defendant did not withdraw. If the People have not met this burden, you may not find the defendant guilty under an aiding and abetting theory."

Barron did not object to this instruction; therefore, he forfeited review of it unless he can show that it resulted in a miscarriage of justice. (*Anderson, supra*, 152 Cal.App.4th at p. 927.) As we explain, there was no miscarriage of justice.

 Barron finds fault in the instruction, as given, because it does not allow for the withdrawal defense if the defendant attempts to notify the other participants but such notification is impossible. This argument is without merit because the instruction properly states the law—that is, (1) the aider and abettor must notify everyone else he knows is involved in the commission of the crime that he is no longer participating and (2) that notification must be made early enough to prevent the commission of the crime. (See *People v. Norton* (1958) 161 Cal.App.2d 399, 403 [327 P.2d 87].) Waiting too long before attempting to notify the other participants, making it impossible to accomplish the notification, does not qualify for the withdrawal defense. Even assuming Barron had a change of heart, he waited too long, as a matter of law, before attempting to complete the steps necessary for a withdrawal defense. It was too late to notify the other participants and too late to prevent the crime. It was too late to withdraw.

Accordingly, the trial court had no duty to instruct Barron's jury concerning impossibility, as it relates to the notification prong of the withdrawal defense. Additionally, Barron's alternative argument that counsel was ineffective for failing to object to the withdrawal defense instruction is without merit.

## C. Instruction to View Accomplice Testimony with Caution

Barron contends that the trial court erred by not instructing the jury that Battle and Abramyan were accomplices as a matter of law and that the jury should therefore view their testimony with caution. Barron forfeited this argument by failing to object to the instructions in the trial court. (*Anderson, supra*, 152 Cal.App.4th at p. 927.) Even assuming the trial court should have instructed Barron's jury that Battle and Abramyan were accomplices as a matter of law and that it should view their testimony with caution, there was no miscarriage of justice.

 "An accomplice is 'one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given.' ([Pen. Code, ]§ 1111.) [¶] 'The general rule is that the testimony of all witnesses is to be judged by the same legal standard. In the case of testimony by one who might be an accomplice, however, the law provides two safeguards. The jury is instructed to view with caution testimony of an accomplice that tends to incriminate the defendant. It

is also told that it cannot convict a defendant on the testimony of an accomplice alone.' [Citations.] [¶] Error in failing to instruct the jury on consideration of accomplice testimony at the guilt phase of a trial constitutes state-law error, and a reviewing court must evaluate whether it is reasonably probable that such error affected the verdict. [Citation.]" (*People v. Williams* (2010) 49 Cal.4th 405, 455–456 [111 Cal.Rptr.3d 589, 233 P.3d 1000].)[3]

The trial court gave an instruction identifying Stringer and Mikhail Karsliyev as possible accomplices whose testimony should be viewed with caution. Even assuming the court should have included Battle and Abramyan as accomplices in that instruction, it is not reasonably probable the error affected the verdict because (1) the court instructed the jury thoroughly on evaluating witness credibility and (2) the instruction on viewing accomplice testimony with caution did not exclude its application to Battle and Abramyan.

The court instructed the jury using CALCRIM No. 226, concerning the evaluation of witness testimony. The jury was instructed, among other things, to use its common sense and experience, to consider anything tending to prove or disprove the truth or accuracy of the testimony and whether the testimony was influenced by bias or prejudice or a personal interest in the case, and to determine whether the witness engaged in conduct reflecting on believability. This instruction, alone, was sufficient in this case to prevent prejudice for failure to identify Battle and Abramyan as accomplices whose testimony should be viewed with caution because the participation of Battle and Abramyan in the murder was well established.

After instructing the jury on how to determine whether Stringer and Karsliyev were accomplices, the court gave general instructions on how to treat accomplice testimony. Of note here, the court stated: "Any testimony of an accomplice that tends to incriminate the defendant should be viewed with caution. You may not, however, arbitrarily disregard it. You should give that testimony the weight you think it deserves after examining it with care and caution and in the light of all the other evidence." Although the trial court instructed the jury to determine whether Stringer and Karsliyev were accomplices, it did not limit the jury from determining that Battle and Abramyan were accomplices and from applying the caution concerning accomplice testimony.

Barron, therefore, fails to establish prejudicial error in the court's accomplice instructions.

---

[3] Barron makes a brief argument that failure to give the accomplice instruction as to Battle and Abramyan was federal constitutional error. We are bound by the Supreme Court's holding in *Williams* to the contrary. (*People v. Williams, supra,* 49 Cal.4th at pp. 455–456; see *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937].)

D. *Instruction on Conspiracy*

Barron contends that the trial court gave but then struck the instruction concerning the elements of conspiracy. Therefore, according to Barron, his conviction on the conspiracy count must be reversed. To the contrary, the trial court properly gave the conspiracy instruction and then referenced the conspiracy instruction in a later instruction. It was the reference in the later instruction that the trial court struck, not the conspiracy instruction itself.

The trial court instructed the jury on the elements of conspiracy, using CALCRIM No. 563. Later, the court instructed the jury concerning murder by lying in wait, using CALCRIM No. 540A. Although the next instruction in the packet given to the jury was CALCRIM No. 540B—"Murder by Lying in Wait: First Degree—Co-participant Allegedly Committed Fatal Act," it appears that the trial court skipped that instruction in its initial oral instructions.

As it appeared in the instruction packet to be sent into the jury room, CALCRIM No. 540B read, in part: "To decide whether the defendant was a member of a conspiracy to commit a crime, please refer to the separate instructions 417, 418, 419, 420 and 563."

Before the jury retired to deliberate, the court made the following statement to the jury:

"All right. Jury members, before we begin I read you some general instructions. There's one I want to correct somewhat.

"It deals with—in your packet that would be 540B, murder by lying in wait first degree co-participant allegedly committing fatal acts. [(Apparently, the court did not realize it had skipped CALCRIM No. 540B in the oral presentation.)] And it should be on page 48 in your instruction packet. And we're dealing with the next to last paragraph where I tell you to look for certain instructions.

"And it should read when you see 419 and 420 there should be a period and 563 is stricken.

"Everyone can remember that. Well, if you can't remember it's not going to refer to 563. I just want to let you know that. Because when I read them to you it said 563."

The court sent a note into the jury room which stated: "The Court instructed the jury not to consider instruction 563. Please disregard that

instruction as it was in error. Instruction 563, which deals with Count One, is located on numerical pages 39 and 40 of your instructions."

Barron contends that this series of instructions and amendments instructed the jury to disregard the court's instructions on conspiracy and, therefore, the jury was not instructed on the elements of conspiracy, which is reversible per se. We disagree that the series of instructions amounted to a direction to the jury to disregard CALCRIM No. 563 as a guide to determining whether the elements of a conspiracy were present.

We review the instructions to determine whether there is a reasonable likelihood that the jury would have understood them correctly. (*People v. Cole* (2004) 33 Cal.4th 1158, 1212 [17 Cal.Rptr.3d 532, 95 P.3d 811].) "It is well established that the instruction 'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record." (*Estelle v. McGuire* (1991) 502 U.S. 62, 72 [116 L.Ed.2d 385, 399, 112 S.Ct. 475], quoting *Cupp v. Naughten* (1973) 414 U.S. 141, 147 [38 L.Ed.2d 368, 373, 94 S.Ct. 396].)

Here, although the court's written instruction was ambiguous concerning whether to disregard the reference to CALCRIM No. 563 in CALCRIM No. 540B or to disregard CALCRIM No. 563 altogether, the oral instruction to the jury made it clear that it was limited to the reference in CALCRIM No. 540B only. The court told the jury: "And it should read when you see 419 and 420 there should be a period and 563 is stricken." Furthermore, there is no evidence in the record that the jury felt it had no definition of conspiracy from which to work. Accordingly, Barron's claim of instructional error is without merit.

E. *Parole Revocation Fine*

The trial court imposed and suspended a parole revocation fine pursuant to Penal Code section 1202.45. As noted above, in part IC., imposing the parole revocation fine was improper. Therefore, it must be stricken.

III

*Abramyan's Contentions*

Abramyan testified on his own behalf and produced the testimony of his sisters and his mother concerning Norik's long-term abuse of the family members. He also had an expert testify concerning the effect of such long-term abuse on Abramyan.

Abramyan's mother, Siran, married Norik in an arranged marriage in Armenia. They came to the United States in 1990.

Abramyan was born in 1987, and was 19 years old when Norik was killed. He has three sisters: Anna (born in 1985), Ani (born in 1989), and Alina (born in 1991).

We need not recount in detail Norik's abuse of his wife, daughters, and Abramyan, as reflected in the testimony of Abramyan, his mother, and his sisters. At the same time, we do not mean to minimize the extent of the abuse.

Norik was strict and domineering from the beginning of his marriage to Siran. He treated her like a slave. He beat her daily for anything and nothing at all and threatened to kill her. He treated the children the same way and sought to control them financially, even after they moved away and got their own jobs. The mental, physical, and emotional abuse caused Abramyan to feel hopeless, worthless, and, at times, suicidal.

A couple days before the killing, Norik became enraged at 15-year-old Alina over a trivial matter. He kicked her repeatedly, then grabbed her by the hair and hit her. Abramyan and Anna tried to stop the beating, but Norik turned on them. Norik hit Abramyan, who fell to the floor and lost consciousness for a few seconds. After this, Abramyan wanted Norik "gone."

Abramyan offered expert testimony on intimate partner battering. Questioned concerning the effects of violence and victimization on a child, the expert testified: "They can be many. Mostly what we see are children who experience effects of trauma. So, we often see children who are anxious, have nightmares, feel hyper-vigilant about—which means that they're constantly scanning their environment for danger, because some of that's real, some of that's perceived. [¶] So we have children who grow up knowing—knowing that there's violence in their lives and anticipating future violence which effects [sic] their perceptions of the world and their safety in the world." The expert stated that a person who had been abused and had witnessed abuse would "develop[] a sense of what's escalating danger in his family because he's experienced, he's seen it. [¶] And so his perception of dangerousness would be lightened by his own experience. And if something happened or series of events happened that caused him to see that abuse escalating based on that experience then it would make sense in his world and his mind for him to believe that he needed to protect those around him and himself."

A. *Instruction on Imperfect Self-defense and Defense of Others*

Citing his evidence of Norik's abusive conduct and the expert testimony concerning intimate partner battering, Abramyan contends the trial

court erred by not instructing the jury, sua sponte, concerning voluntary manslaughter based on imperfect self-defense and imperfect defense of others. We conclude that Abramyan forfeited this contention by failing to object to the instructions (*Anderson, supra,* 152 Cal.App.4th at p. 927) and, in any event, there was no miscarriage of justice because the evidence did not support giving the instructions.

■ A trial court must instruct, sua sponte, "on all theories of a lesser included offense which find substantial support in the evidence." (*People v. Breverman* (1998) 19 Cal.4th 142, 162 [77 Cal.Rptr.2d 870, 960 P.2d 1094].)

Here, the trial court did not instruct the jury concerning voluntary manslaughter based on imperfect self-defense and imperfect defense of others. In denying a motion for new trial, the court gave its reasons for not giving the instructions. It said: "There is not substantial evidence to support the giving of self-defense instructions, defense of others instruction, imperfect self-defense instruction, imperfect self-defense [*sic*] of others instructions in that all we have—we do not have an immediacy in terms of harm that's central to self-defense instructions as it pertains—central. Self-defense, defense of others, imperfect self-defense, and imperfect defense of others that is a common thread that runs through that." The court was correct.

■ "For killing to be in self-defense, the defendant must actually and reasonably believe in the need to defend. [Citation.] If the belief subjectively exists but is objectively unreasonable, there is 'imperfect self-defense,' i.e., 'the defendant is deemed to have acted without malice and cannot be convicted of murder,' but can be convicted of manslaughter. [Citation.] To constitute 'perfect self-defense,' i.e., to exonerate the person completely, the belief must also be objectively reasonable. [Citations.] . . . [F]or either perfect or imperfect self-defense, the fear must be of imminent harm. 'Fear of future harm—no matter how great the fear and no matter how great the likelihood of the harm—will not suffice. The defendant's fear must be of imminent danger to life or great bodily injury.' [Citation.]" (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1082 [56 Cal.Rptr.2d 142, 921 P.2d 1], fn. & italics omitted.) All the surrounding circumstances, including prior assaults and threats, may be considered in determining whether the accused perceived an imminent threat of death or great bodily injury. (*Id.* at p. 1083; see also *People v. Michaels* (2002) 28 Cal.4th 486, 530–531 [122 Cal.Rptr.2d 285, 49 P.3d 1032].) Evidence Code section 1107 permits admission of expert testimony regarding intimate partner battering, but it does not modify the imminence requirement.[4] "[B]oth self-defense and defense of others, whether

---

[4] Evidence Code section 1107, subdivision (a) states: "In a criminal action, expert testimony is admissible by either the prosecution or the defense regarding intimate partner battering and its effects, including the nature and effect of physical, emotional, or mental abuse on the

perfect or imperfect, require an actual fear of *imminent* harm. [Citation.]" (*People v. Butler* (2009) 46 Cal.4th 847, 868 [95 Cal.Rptr.3d 376, 209 P.3d 596], original italics.)

 "This definition of imminence reflects the great value our society places on human life. The criminal law would not sentence to death a person such as the victim in this case for a murder he merely threatened to commit, even if he had committed threatened murders many times in the past and had threatened to murder the defendant; it follows that the criminal law will not even partially excuse a potential victim's slaying of his attacker unless more than merely threats and a history of past assaults is involved." (*People v. Aris* (1989) 215 Cal.App.3d 1178, 1189 [264 Cal.Rptr. 167], disapproved on another ground in *People v. Humphrey, supra*, 13 Cal.4th at p. 1089.)

Abramyan testified that, at the time of the shooting, Norik posed no danger to him, to his mother, or to his sisters. He knew that Norik posed no danger to him or others at the time of the killing. Abramyan asserts, however, that, despite his own testimony that Norik posed no danger to him, to his mother, or to his sisters at the time of the shooting, the jury could conclude that he feared imminent harm to himself or to others because he was the victim of intimate partner battering.[5] The problem with this assertion is that the evidence was to the contrary—he did not fear imminent harm from Norik at the time of the shooting.

When asked on direct examination why he had his father killed, Abramyan responded: "Because all the abuse that he did to my mom, my sisters and myself throughout the past ten years that I know of. I just really felt that he was going to kill my mom and my sisters. [¶] . . . [¶] . . . I felt like as a man I had to stand up and take control of my family, you know, so me, mom and sisters could be happy again. [¶] . . . He caused fear and terror in the house every time he was around."

Abramyan's testimony, as well as that of his mother and sisters, established past abuse by Norik. And Abramyan's testimony was evidence that he feared Norik would continue the abuse in the future. But it did not establish imminence, or that Abramyan even believed harm was imminent.

The expert testimony concerning intimate partner battering does not help in this regard. The testimony supported Abramyan's testimony that he feared

---

beliefs, perceptions, or behavior of victims of domestic violence, except when offered against a criminal defendant to prove the occurrence of the act or acts of abuse which form the basis of the criminal charge."

[5] This is an obvious broadening of the term "intimate partner battering," as Abramyan was the victim's son, not intimate partner. However, this is the general theory Abramyan relies on, and, because the reliance is misplaced on the facts, we need not discuss whether the theory properly extends to those who are not intimate partners.

future harm from Norik; however, like Abramyan's testimony, it did not establish fear of imminent harm. Instead, the actual evidence of Abramyan's state of mind was that he did not fear imminent harm. Norik had not threatened Abramyan, and Abramyan knew Norik was not armed. He knew that, when he returned to the car, Norik would not harm him. Norik posed no immediate danger to Abramyan, to his mother, or to his sisters. Because there was no evidence of fear of imminent harm, the evidence was insufficient to support an instruction on voluntary manslaughter based on imperfect self-defense and imperfect defense of others.

In support of his argument that the evidence was sufficient to support an instruction on voluntary manslaughter, Abramyan cites cases supporting an imperfect self-defense theory in which the defendants actually believed harm was imminent even though a reasonable person would not have believed it. (See *In re Walker* (2007) 147 Cal.App.4th 533 [54 Cal.Rptr.3d 411] [evidence supported finding that defendant had actual fear of imminent harm even if the fear was unreasonable]; *People v. Aris, supra*, 215 Cal.App.3d 1178 [defendant had actual belief in imminent harm even though victim sleeping].) These cases are unhelpful to Abramyan because the evidence here is that he did not actually fear imminent harm to himself or others.

Finally, in his reply brief, Abramyan asserts that because he was not the actual killer we should consider his mental state when he aided and abetted the killing. He claims we should determine his mental state from the failed plan for Barron to intercept Norik as Norik entered the apartment. This new argument is factually untenable because the original plan to kill Norik at the apartments did not result in a killing. Only the later plan, proposed by Abramyan, to have Norik ambushed at the video store resulted in a killing. At the video store, Abramyan aided and abetted the murder but had no actual fear of imminent harm.

The trial court did not err by not giving instructions concerning voluntary manslaughter based on imperfect self-defense and imperfect defense of others.

### B. *Imperfect Self-defense and Conspiracy*

Again asserting that there was sufficient evidence to support instructions and argument on voluntary manslaughter based on imperfect self-defense and imperfect defense of others, Abramyan contends the trial court erred by not instructing on those theories with respect to the conspiracy charge. Because, as discussed above, we conclude that the evidence was not sufficient to support instructions on imperfect self-defense and imperfect defense of others, this contention fails. The trial court had no duty to instruct on theories not supported by the evidence.

### C. *Provocation Instruction*

The trial court instructed the jury that "[p]rovocation may reduce murder from first degree murder to second degree." It informed the jury: "If you conclude that the defendant committed murder but was provoked, consider the provocation in deciding whether the crime was first or second degree murder." Abramyan does not take issue with this instruction on provocation; however, he asserts error in what the trial court added to the instruction. It stated: "Provocation does not apply to a prosecution under the theory of murder while lying in wait or to conspiracy to commit murder." Abramyan contends that, with the latter instruction, the trial court effectively directed the jury to ignore his intimate-partner-battering evidence. Abramyan forfeited this argument concerning instructions by failing to make it in the trial court. (*Anderson, supra,* 152 Cal.App.4th at p. 927.) In any event, there was no miscarriage of justice because the trial court did not mislead the jury.

 Abramyan contends that the instruction was a misstatement of the law because murder by lying in wait and conspiracy to commit murder both require malice and provocation negates malice. While it is true that those crimes require malice, the finding of (1) lying in wait or (2) conspiracy to commit the murder supplies that finding of malice, which cannot be reduced by provocation. (See *People v. Stanley* (1995) 10 Cal.4th 764, 794 [42 Cal.Rptr.2d 543, 897 P.2d 481] [lying in wait functional equivalent of premeditation, deliberation, and intent to kill].) A murder committed by lying in wait is always first degree murder. "All murder which is perpetrated by means of . . . lying in wait . . . or by any other kind of willful, deliberate, and premeditated killing . . . is murder of the first degree." (Pen. Code, § 189.) Therefore, if the jury found murder by lying in wait, provocation was irrelevant because the murder could not be reduced to second degree murder. Likewise, a conspiracy to commit murder is always a conspiracy to commit first degree murder and provocation cannot reduce it to a conspiracy to commit second degree murder. (*People v. Cortez* (1998) 18 Cal.4th 1223, 1237 [77 Cal.Rptr.2d 733, 960 P.2d 537].)

 Despite this law, Abramyan asserts that "there is a reasonable likelihood that the jury understood the instruction on 'provocation' to include [Abramyan's intimate-partner-battering] defense, making it unavailable as a defense to conspiracy to commit murder and first degree murder by lying in wait." This assertion fails because provocation, no matter the means of proving it, is not a defense to murder by lying in wait or conspiracy to commit murder. As noted, provocation serves to reduce a murder from first to second degree, but, also as noted, second degree murder by lying in wait and conspiracy to commit second degree murder do not exist as crimes in California.

In his reply brief, Abramyan makes the additional assertion that the trial court's instruction misled the jury because it stated that "[p]rovocation does not apply to a *prosecution* under the theory of murder while lying in wait or to conspiracy to commit murder." (Italics added.) This additional point is forfeited because Abramyan did not make it in the opening brief. (*People v. Smithey* (1999) 20 Cal.4th 936, 1017, fn. 26 [86 Cal.Rptr.2d 243, 978 P.2d 1171] [point raised in reply brief untimely].) In any event, it is not reasonably probable that the trial court's reference to the prosecution for those offenses, rather than simply referring to those offenses, misled the jury.

### D. *Effective Assistance of Counsel*

Abramyan contends his trial counsel was incompetent for failing to request instructions and to make an argument that, based on imperfect self-defense and imperfect defense of others, he did not harbor malice. The contention is without merit because the facts did not support instructions or argument based on imperfect self-defense or imperfect defense of others.

A criminal defendant is constitutionally entitled to effective assistance of counsel. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15; *Strickland v. Washington* (1984) 466 U.S. 668, 684–685 [80 L.Ed.2d 674, 691, 104 S.Ct. 2052] (*Strickland*); *People v. Pope* (1979) 23 Cal.3d 412, 422 [52 Cal.Rptr. 732, 590 P.2d 859] (*Pope*), disapproved on another ground in *People v. Berryman* (1993) 6 Cal.4th 1048, 1081, fn. 10 [25 Cal.Rptr.2d 867, 864 P.2d 40].) To show denial of that right to counsel, a defendant must establish (1) trial counsel's performance was below an objective standard of reasonableness under prevailing professional norms and (2) the deficient performance prejudiced the defendant. (*Strickland, supra*, at pp. 687, 691–692; *People v. Ledesma* (1987) 43 Cal.3d 171, 216–217 [233 Cal.Rptr. 404, 729 P.2d 839] (*Ledesma*); *Pope, supra*, at p. 425.) To show prejudice, a defendant must show there is a reasonable probability he or she would have received a more favorable result had trial counsel's performance not been deficient. (*Strickland, supra*, at pp. 693–694; *Ledesma, supra*, at pp. 217–218.) It is the defendant's burden on appeal to show that he was denied effective assistance of counsel and is entitled to relief. (*Ledesma, supra*, at p. 218.)

Abramyan's effective assistance of counsel contention fails on the first prong—a showing of incompetence. Because the evidence did not support an argument that Abramyan harbored no malice because he actually feared imminent harm to himself or others, trial counsel competently did not make the argument.

Because Abramyan failed to establish incompetence, we need not consider prejudice.

### E. *Lying-in-wait Instruction and Attempted Lying in Wait*

The trial court modified an instruction on felony murder to instruct the jury on murder by lying in wait. In doing so, the court left in the concept of attempt, thus instructing the jury that it could find Abramyan guilty of first degree murder if Abramyan "committed or attempted to commit murder by lying in wait." Abramyan contends that the trial court erred by instructing the jury that it could convict of murder by lying in wait based on an attempt to lie in wait. He also contends that this alleged misinstruction infected the otherwise correct special circumstance instruction on lying in wait. The Attorney General contends that any error was harmless beyond a reasonable doubt. We agree that the instruction, even if erroneous, was harmless beyond a reasonable doubt.

Using CALCRIM No. 521, the trial court instructed the jury concerning first degree murder, including murder by lying in wait. CALCRIM Nos. 540A and 540B provide the elements for felony murder. The trial court modified CALCRIM Nos. 540A and 540B to provide the jury with instructions concerning finding Abramyan guilty of murder by lying in wait, both as an actual killer and as an aider and abettor. In modifying these instructions, however, the trial court failed to take out language concerning "attempt" which applies to felony murder instructions but not to lying in wait. The court therefore instructed, in part:

"To prove that the defendant is guilty of first degree murder under this theory, the People must prove that:

"1. The defendant committed *or attempted to commit* murder by lying in wait;

"AND

"2. While committing *or attempting to commit* murder by lying in wait the defendant did an act that caused the death of another person." (Italics added.)

"To prove that the defendant is guilty of first degree murder under [an aider and abettor] theory, the People must prove that:

"1. The defendant committed, *attempted to commit*, aided and abetted or was a member of a conspiracy to commit murder by lying in wait.

"2. The defendant intended to commit, intended to aid and abet the perpetrator in committing, or intended that one or more of the members of the conspiracy commit murder by lying in wait;

"3. If the defendant did not personally commit *or attempt to commit*, murder by lying in wait, then a perpetrator, whom the defendant was aiding and abetting or with whom the defendant conspired, personally committed, or *attempted to commit* murder by lying in wait;

"4. While committing *or attempting to commit*, murder by lying in wait, the perpetrator did an act that caused the death of another person;

"AND

"5. There was a logical connection between the act causing death and the Lying in wait *or attempted Lying in wait*. The connection between the fatal act and the Lying in wait *or attempted Lying in wait* must involve more than just their occurrence at the same time and place." (Italics added.)

▇▇▇ The Attorney General makes no argument that an attempt to lie in wait supports a first degree murder conviction; therefore, we must determine whether the instructions were prejudicial. (Cal. Const., art. VI, § 13.) The California Supreme Court recently dealt with a similar issue of whether an erroneous alternative theory of guilt prejudiced the defendant. (*People v. Chun* (2009) 45 Cal.4th 1172 [91 Cal.Rptr.3d 106, 203 P.3d 425].) Quoting a concurring opinion in a United States Supreme Court case, the *Chun* court stated: " 'The error in the present case can be harmless only if the jury verdict on other points effectively embraces this one or if it is impossible, upon the evidence, to have found what the verdict did find without finding this point as well.' [Citation.] Without holding that this is the only way to find error harmless, we think this test works well here, and we will use it. If other aspects of the verdict or the evidence leave no reasonable doubt that the jury made the findings necessary [to support the valid alternative theory], the erroneous felony-murder instruction was harmless." (*Id.* at pp. 1204–1205, italics omitted.) We likewise apply the test here, as it is sufficient to conclude there was no prejudicial error because no reasonable jury would have found attempted lying in wait, as opposed to a fully effectuated lying in wait, on the evidence presented.

As the court instructed the jury, lying in wait is accomplished if those lying in wait (1) conceal their purpose from the victim, (2) wait and watch for an opportunity to act, and (3) make a surprise attack from a position of advantage. (CALCRIM No. 521.)

The murder of Norik was planned and executed as a murder by lying in wait. Abramyan lured Norik to the Hollywood Video store and left him in the parking lot, concealing his purpose from Norik while claiming a need to return inside the store. Dillingham and Battle waited and watched in the parking lot for an opportunity to act. There is no evidence that Norik saw Dillingham and Battle or knew of their purpose. When Dillingham and Battle saw that they had an advantage and an element of surprise, they ambushed Norik as he sat unsuspecting in the car. Thus, all of the elements of lying in wait were established.

Abramyan disputes that all of the elements were established by attempting to identify facts that cast doubt on the lying-in-wait elements. For example, he observes that Dillingham and Battle smoked cigars in the parking lot and suggests that, therefore, they were not waiting and watching. He also notes that Dillingham and Battle were dressed like gang members and, therefore, they were not attempting to conceal their purpose. He points out that Dillingham and Battle eventually pulled bandanas over their faces and drew their weapons, thus failing to conceal their violent purpose. Finally, he notes that one of them talked on a cell phone while in the parking lot and, therefore, they were not waiting and watching for an opportunity to act. To the contrary, none of these circumstances would have led a reasonable jury to conclude that any of the lying-in-wait elements was not established.

The jury concluded that Abramyan conspired with the other defendants to kill Norik and aided and abetted that killing. Therefore, considering the evidence relating to the conduct of Dillingham and Battle in the parking lot of the Hollywood Video store, the only conclusion a reasonable jury would have reached is that the murder was committed by lying in wait.

Abramyan adds, however, that the jury could have found an attempted lying in wait from the incident at the apartment complex when the ambush there was called off. We disagree. The jury was instructed that the lying-in-wait element related to the manner in which the killing was perpetrated: "The defendant is guilty of first degree murder if the People have proved that the defendant *murdered* while lying in wait or immediately thereafter. . . ." (Italics added.) No reasonable jury would have concluded that any lying in wait or attempted lying in wait at the apartment complex supported a first degree murder conviction for the killing at the video store.

Accordingly, Abramyan's contention that the misstatements concerning attempted lying in wait in the court's instructions caused him prejudice is without merit.

Abramyan also contends that, although the jury was properly instructed on the lying-in-wait special circumstance, the faulty instruction concerning murder by attempted lying in wait infected the jury's consideration of the lying-in-wait special circumstance. For the same reasons discussed above, we conclude that the instruction did not affect the jury's proper consideration of the lying-in-wait special circumstance.

F. *Lying-in-wait Instruction Concerning Timing*

Concerning lying in wait, the trial court instructed the Abramyan jury, in part: "The lying in wait need not continue for any particular period of time provided that its duration be substantial, that is, an amount of time that shows the killer had a state of mind equivalent to premeditation and deliberation." On the prosecutor's motion, the trial court gave the jury a special instruction in addition to the instruction on lying in wait. The court stated: "As referred to in the lying in wait instructions, a substantial period of time could occur within 90 seconds." Before giving the instruction, the court notified Abramyan's counsel that it would give the instruction, and Abramyan's counsel did not object.

On appeal, Abramyan contends that the instruction was an incorrect statement of law and violated his federal due process rights. He argues: "By telling jurors that a period of time within 90 seconds *could* be substantial, the instruction implied that a period of time beyond 90 seconds *must* be substantial." (Italics added.) Abramyan reads too much into the instruction. The wording was a correct statement of the law and did not direct the jury to find that a period of time more than 90 seconds is substantial.

The trial court's instruction was based on *People v. Moon* (2005) 37 Cal.4th 1 [32 Cal.Rptr.3d 894, 117 P.3d 591], in which the Supreme Court held that, under the facts of that case, 90 seconds was a sufficient amount of time to support the jury's finding that the defendant lay in wait. (*Id.* at p. 23.) The court continued: "Although we have held the period of watchful waiting must be 'substantial' [citation], we have never placed a fixed time limit on this requirement. Indeed, the opposite is true, for we have previously explained that '[t]he precise period of time is also not critical.' [Citation.] Even accepting defendant's testimony that he waited only a few scant minutes before killing [the victim], a few minutes can suffice. [Citations.]" (*Ibid.*)

As shown by *Moon*, 90 seconds can be a sufficient period of time to support a lying-in-wait instruction. Therefore, the trial court's instruction, here, was a correct statement of law. It did not take from the jury its role, as it was instructed, of determining what is a "substantial" period of time. Instead, it merely stated that a period as short as 90 seconds can be substantial. Furthermore, contrary, to Abramyan's assertion, the instruction did not state or imply that the jury must find substantial any period of time more than 90 seconds.

Abramyan relies heavily on *People v. Reyes Martinez* (1993) 14 Cal.App.4th 1412 [18 Cal.Rptr.2d 300], in which the appellate court found error in instructing the jury that moving the victim 500 feet is sufficiently substantial to sustain the movement element a kidnapping conviction. (*Id.* at p. 1417; see also *People v. Daniels* (1993) 18 Cal.App.4th 1046, 1052–1053 [22 Cal.Rptr.2d 877].) The court held that, although 500 feet can be a substantial distance, it is not necessarily so, and it is the province of the jury to determine whether the distance is substantial. Therefore, the trial court erred by telling the jury that 500 feet is substantial. The clear distinction between *Reyes Martinez* and this case is that the trial court in this case did not instruct the jury that 90 seconds is a substantial period of time; instead, it merely stated that it can be. This left to the jury the determination of whether the period of time during which the coconspirators watched and waited was substantial.

Because the court's instruction properly stated the law and did not invade the province of the jury, it did not violate Abramyan's federal due process rights.

### G. *Sufficiency of Evidence of Financial Gain*

Abramyan contends that the evidence was insufficient to sustain the financial-gain special circumstance because the person he paid to commit the murder was not the actual killer. We disagree. One who hires for murder is subject to the financial-gain special circumstance regardless of whether he directly hires the actual killer or there is an intermediary between the hirer and the actual killer.[6]

Enacted as part of the Briggs Initiative in 1978, Penal Code section 190.2, subdivision (a)(1) provides for a special circumstance if "[t]he murder was intentional and carried out for financial gain." Subdivision (c) of Penal Code section 190.2 makes accomplices liable for special circumstances: "Every

---

[6] The prosecution did not pursue a theory that Abramyan, himself, would profit financially from Norik's murder.

person, not the actual killer, who, with the intent to kill, aids, abets, counsels, commands, induces, solicits, requests, or assists any actor in the commission of murder in the first degree shall be punished by death or imprisonment in the state prison for life without the possibility of parole if one or more of the special circumstances enumerated in subdivision (a) has been found to be true . . . ."

"Thus, by the terms of the statute, 'one who intentionally aids or encourages a person in the deliberate killing of another for the killer's own financial gain is subject to the special circumstance punishment.' [Citation.] [¶] The result is a sensible one. The likelihood that one who hires another to kill the victim is motivated by a desire to enrich the killer is remote; the hirer is far more likely to have motives of his own, motives which are not necessarily pecuniary. Thus, when a person commits murder for hire, the one who did the hiring is guilty of the financial gain special circumstance only as an accomplice. [Citation.]" (*People v. Padilla* (1995) 11 Cal.4th 891, 933 [47 Cal.Rptr.2d 426, 906 P.2d 388], italics omitted, overruled on other grounds in *People v. Hill* (1998) 17 Cal.4th 800, 823, fn. 1 [72 Cal.Rptr.2d 656, 952 P.2d 673].)

"[O]ne who intentionally aids or encourages a person in the deliberate killing of another for the killer's own financial gain is subject to the special circumstance punishment." (*People v. Freeman* (1987) 193 Cal.App.3d 337, 339 [238 Cal.Rptr. 257].)

Abramyan attempts to parse from this precedent a requirement that, to be liable for a financial-gain special circumstance as an accomplice, the defendant must have aided or encouraged the actual killer. He therefore claims that, because the accomplice with whom he bargained for the killing of Norik did not commit the actual killing, he is not criminally liable under the financial-gain special circumstance.

This argument was made and rejected in *People v. Singer* (1990) 226 Cal.App.3d 23 [275 Cal.Rptr. 911] (*Singer*). In that case, the court stated: "There is abundant evidence that defendant solicited and procured the killing. He maintains, however, that the statute only applies where the hirer directly aids and abets the actual killer and that there is no evidence that he aided and abetted . . . the hit-man, as opposed to . . . the intermediary. [¶] We begin by noting that subdivision (b) of [Penal Code] section 190.2 differs from the general aiding and abetting statute which uses the terms 'aid,' 'abet,' 'compel,' 'advis[e],' 'counsel[]' and 'encourag[e],' among others. ([Pen. Code, ]§ 31.) Subdivision (b) of [Penal Code] section 190.2, by contrast, uses all

those terms plus 'induce[]' and 'solicit[],' words which strongly suggest murder for hire and the possibility of go-betweens, as opposed to personal involvement with the actual killer. . . . Finally, it is hard to see why, as a matter of policy, the Legislature would want to differentiate between a murder for hire where there is no intermediary and one where there is. Apart from possible causation problems where the link between the hirer and actual killer is extremely attenuated (not our case), the moral culpability of the hirer would be the same. (*People* v. *Freeman, supra*, 193 Cal.App.3d 337, 340.) The distinction urged by defendant would tend to snare amateurs while letting practiced killers with impersonal, large networks of thugs off the hook. It hardly makes sense." (*Singer, supra*, at pp. 43–44, italics omitted.)

We agree with the analysis in *Singer* that one who hires for murder is subject to the financial-gain special circumstance regardless of whether he directly hires the actual killer or there is an intermediary between the hirer and the actual killer.

Abramyan attempts to distinguish *Singer* because in *Singer* there was some evidence of contact between the defendant and the actual killer. En route to the killing, the killer's car broke down. At the behest of the intermediary, the actual killer called the defendant for money, but the defendant refused until the job was done. (*Singer, supra*, 226 Cal.App.3d at pp. 44–45.) The *Singer* court, however, did not rely on this minimal contact in the quoted holding. (*Id.* at pp. 43–44.) We agree. The fact that in *Singer* there may have been minimal contact between the defendant and the actual killer does not detract from the holding that a financial-gain special circumstance may be found true if the defendant hired an intermediary who then hired the actual killer.

The evidence was therefore sufficient to support the financial-gain special circumstance as to Abramyan.

### H. *Instruction on Financial Gain*

Abramyan contends that the trial court's special instruction concerning the financial-gain special circumstance improperly instructed the jury that the hirer of a murderer is subject to the financial-gain special circumstance even if his motive was not financial gain. To the contrary, the instruction accurately reflected Supreme Court precedent on the issue.

The trial court used the CALCRIM pattern instruction to instruct the jury on the financial-gain special circumstance, informing the jury that the elements of the financial-gain special circumstance are (1) the defendant's intent to kill, (2) a killing carried out for financial gain, and (3) an expectation that financial gain would result from the killing. (See CALCRIM No. 720.)

The court then added a special instruction. It stated: "If a person commits murder for hire, the one who did the hiring is subject to the financial gain special circumstance even if his motives are not for financial gain. You must still determine whether the defendant hired someone with the specific intent to kill Norik Abramyan."

Abramyan asserts that, because the Supreme Court held that a financial-gain special circumstance applicable to a nonkiller is based on accomplice liability, this special instruction misstates the law because it allows a financial-gain special circumstance even if the defendant had no motive for financial gain himself. Abramyan argues: "This special instruction stated the law in a manner that eliminated the elements required for aiding and abetting the killer's financial gain motive." Based on the same reasoning, Abramyan also argues that the instruction is "an irrational mandatory conclusive presumption."

 While it is true that the Supreme Court has stated that a financial-gain special circumstance applicable to a nonkiller hirer is based on accomplice liability, the court also noted that the hirer need not have the motive to enrich the killer. (*People v. Padilla, supra,* 11 Cal.4th at p. 933, quoted above.) It is enough that (1) the nonkiller hired another to kill, (2) the hirer intended to kill, and (3) the actual killer was motivated by financial gain. Therefore, the instruction properly reflected the law.

## I. *Instruction on Aiding and Abetting*

Abramyan contends that the trial court gave an argumentative special instruction on aiding and abetting and that the instruction invaded the province of the jury. To the contrary, the instruction was not argumentative and did not invade the province of the jury.

The trial court gave the jury a special instruction concerning aiding and abetting, as follows: "Among the factors which may be considered in making the determination of aiding and abetting are: presence at the scene of the crime, companionship, flight, and conduct before and after the offense."

 As Abramyan states in his opening brief, this language mirrors the holding of *In re Lynette G.* (1976) 54 Cal.App.3d 1087 [126 Cal.Rptr. 898] and subsequent cases. The court in *Lynette G.* stated: "Among the factors which may be considered in making the determination of aiding and abetting are: presence at the scene of the crime, companionship, and conduct before and after the offense. [Citations.] In addition, flight is one of the factors which is relevant in determining consciousness of guilt. [Citation.]" (*Id.* at pp. 1094–1095; see also *People v. Medina* (2009) 46 Cal.4th 913, 924 [95 Cal.Rptr.3d 202, 209 P.3d 105].)

"An instruction is argumentative when it recites facts drawn from the evidence in such a manner as to constitute argument to the jury in the guise of a statement of law. [Citation.]" (*People v. Campos* (2007) 156 Cal.App.4th 1228, 1244 [67 Cal.Rptr.3d 904].) An argumentative instruction is " 'an instruction "of such a character as to invite the jury to draw inferences favorable to one of the parties from specified items of evidence." ' [Citation.]" (*People v. Panah* (2005) 35 Cal.4th 395, 486 [25 Cal.Rptr.3d 672, 107 P.3d 790].) For example, in *People v. Panah*, the defense sought an instruction that stated: " 'There is evidence from which you may infer that the decedent was not alive at the time of the sodomy. This evidence includes the testimony of Dr. Heuser concerning the failure of the anal sphincter to constrict. [¶] If you find from the evidence that it was reasonably possible that decedent was dead at the time of the sodomy, you must find the special circumstance to be not true, even though there may be evidence that the deceased was alive. [¶] In order to find the special circumstance of sodomy to be true, you must find that the only reasonable interpretation of the evidence was that the deceased was alive, and this must be proved beyond a reasonable doubt.' " (*Id.* at pp. 485–486.) The Supreme Court concluded that this instruction was properly rejected because it is argumentative.

Abramyan argues that special instructions such as the one given here on aiding and abetting were condemned as argumentative in *People v. Mouton* (1993) 15 Cal.App.4th 1313 [19 Cal.Rptr.2d 423]. Although that case criticized an instruction listing factors to consider in determining whether the defendant aided and abetted the crime, the list in that case included what a later case referred to as "bogus factors," such as failure to aid the victim. (*People v. Lucas* (1997) 55 Cal.App.4th 721, 736 [64 Cal.Rptr.2d 282].) Here, there were no such "bogus factors." The court included only factors validated in *In re Lynette G.* and subsequent cases. Furthermore, the instruction did not refer to specific evidence, only generic factors.

Accordingly, the instruction here was not improperly argumentative. It also did not invade the province of the jury because it merely listed factors. The jury was free to evaluate the evidence and determine whether Abramyan aided and abetted Norik's murder.

### J. *Parole Revocation Fine*

The trial court imposed and suspended a parole revocation fine pursuant to Penal Code section 1202.45. As noted above, in part IC., imposing the parole revocation fine was improper. Therefore, it must be stricken.

## DISPOSITION

The parole revocation fine imposed on each defendant is stricken. As modified, the judgments are affirmed. The trial court is directed to prepare an amended abstract of judgment as to each defendant reflecting the modification to the judgment and to send a copy of the amended abstract to the Department of Corrections and Rehabilitation.

Raye, P. J., and Blease, J., concurred.

The petition of all appellants for review by the Supreme Court was denied November 16, 2011, S196274.