Filed 3/28/13  P. v. Wilson CA1/5

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

THE PEOPLE,

      Plaintiff and Respondent,

      v.

ESTHER D. WILSON,

      Defendant and Appellant.

_____/

A134570

(Solano County
Super.Ct.No. FCR262375)

A jury convicted appellant Esther D. Wilson of forgery (Pen. Code, § 470, subd. (c))[1] and filing a false or forged instrument (§ 115, subd. (a)).  The court placed her on probation.

On appeal, appellant contends insufficient evidence supports the convictions.  We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

In 2000, Make Porter lived with his wife, Louise Toles, in a house he owned at 33 Woodridge Place in Vallejo (the house or the property).  Porter died in July 2002 and

---

[1]  Unless otherwise noted, all further statutory references are to the Penal Code.  Appellant's codefendants, Melvin Strong, Jr., Kevin Merck Frazier, and Brian Maxwell Fabian, are not parties to this appeal and are mentioned only where relevant to the issues raised in appellant's appeal.

1

Toles continued to live in the house. A few months after Porter died, Toles's daughter, Grennan Whitfield, moved into the house to care for Toles.

After Toles had a stroke in April 2003, Whitfield began to help Toles organize her finances. In early 2004, Whitfield learned that Porter had taken out a loan on the house before he married Toles and that Toles was three months behind on the loan payments. Shortly thereafter, Whitfield borrowed $1,300 from a "dear friend . . . Ms. Hattie," to "pay what was owed on the house, to catch up with that bill." Whitfield then tried to borrow money from various loan agencies using the house as collateral to repay Ms. Hattie and to get her mother's "credit cards straightened out. . . ." The loan agencies, however, would not loan Whitfield money because Toles's name was not on the title to the house.

*Kevin Frazier Obtains a Grant Deed to the House*

At that point, Whitfield called Ms. Hattie's son, Melvin Strong, Jr., and told him she needed help getting a loan. Strong told Whitfield he had a friend, Frazier, who could help her. Whitfield and Toles met with Frazier; Whitfield told him they needed $5,000 to repay Ms. Hattie and to settle Toles's credit card debt. Whitfield explained that she could not borrow money because "the title deed to the house was in [Porter's] name" and that Porter was deceased. Frazier represented he was a loan agent and said he could help Whitfield and Toles and asked for Porter's social security card.

Several months later, in September 2004, Toles became very ill and was admitted to the hospital. Whitfield called Frazier and told him her mother was "in critical condition" and that she needed to get Toles's financial "problems resolved[.]" Frazier came to Toles's hospital room with Caitlin America, a notary; he said he needed Toles's thumbprint and Whitfield's signature on numerous documents, which would help get financing. According to Whitfield, Toles "couldn't speak. She was just laying there, and [Frazier] took her hand and took her thumbprint." Neither Frazier nor the notary tried to

2

speak with Toles. Instead, Frazier took Toles's thumbprint on a paper and left the room.[2] Outside the room, Frazier had Whitfield sign a grant deed. The notary stamped the deed, which Frazier also signed.[3] When Whitfield signed in the wrong place because she was "so emotional," Frazier showed her where to sign. Whitfield did not see Toles sign the grant deed and did not believe she was capable of doing so. Whitfield did not have power of attorney for Toles. Whitfield and Toles never discussed granting or selling the property to Frazier. Frazier left the hospital with all of the documents. Toles died in late October 2004.

A few months after Toles died, Frazier told Whitfield he wanted to have the house appraised. He also said he was working on the getting Whitfield the loan and that he needed Toles's death certificate. Whitfield never received any money from Frazier. She stopped speaking to Frazier after she later "found out that [he] was not who he claimed to be. . . ." Frazier recorded the deed; after Toles died, he recorded an affidavit of death of joint tenant.

*Escrow Proceedings Involving the House*

In 2004, Shannon Esclovon-Hunt was working as an escrow officer for New Century Title. In December 2004, Rowan and Associates opened escrow for the purchase of the house.[4] Esclovon-Hunt prepared documents showing Frazier was the buyer and Porter was the ostensible seller. Several of the escrow documents Esclovon-Hunt received from Rowan and Associates were "signed" by Porter in January 2005, well after his death. There were also four demands for payment ostensibly signed by Porter.

---

[2] America testified she read the grant deed to Toles, who indicated she understood she was giving title to the house to someone else by squeezing America's hand. According to America, Toles signed the deed and the notary book with an "X."

[3] The grant deed states Toles "hereby grants [the property] to . . . Toles . . . and . . . Frazier as joint tenants[.]" At trial, Whitfield testified the grant deed has a misspelled, typewritten version of Toles's name; above Toles's name is a signature that is not Toles's. The words "zero gift" appear on the deed. During a deposition taken in civil litigation involving the house, Frazier admitted writing "zero" and "gift" on the deed.

[4] About a week or two earlier, Capital Investments tried to refinance the property for Frazier but was unable to do so because Frazier was not the owner of the property.

3

In January 2005, appellant notarized a grant deed ostensibly signed by Porter and received $150, a notary fee that Esclovon-Hunt opined was not "outrageous" for that type of transaction.

Escrow closed in January 2005 and Esclovon-Hunt disbursed the funds according to the instructions she received, including the payoff demands that bore Porter's signature. First InterBank Mortgage, a company controlled by Brian Fabian, received $40,000. Online Construction Company, an entity associated with Strong, received $25,000, and Strong personally received $3,500. Esclovon-Hunt distributed almost $172,000 to a business Frazier formed.

*The Investigation and the Relationship Between Appellant and Fabian*

After escrow closed, Esclovon-Hunt learned from the title company that Porter was deceased. She asked appellant for a copy of Porter's driver's license. Appellant complied. She claimed she did not know Porter was deceased. As soon as Esclovon-Hunt received the license, she knew something was "wrong with it" and that it "wasn't real" because the "name and everything was typewritten" and because the "birth date [did not] match the date of birth. Your license expires on your birthday." It did not look like a "regular California driver's license." A document examiner determined Fabian was "conclusive[ly]" the author of four of the documents from the escrow transaction, and "probably" the author of Porter's signature on the grant deed appellant notarized.[5]

Fabian worked at Rowan and Associates. Appellant performed notary work for Rowan and Associates. Appellant had previously worked for Fabian in an office in Richmond. In 2005, Fabian, Rowan and Associates, and appellant had offices on the same floor of an Oakland building.

Ashley Ash, an investigator for the Solano District Attorney's Office, spoke with appellant on the telephone in early 2006. Appellant acknowledged notarizing the grant

---

[5]     The document examiner explained that there was "minimal doubt" about Fabian's authorship of the grant deed. He explained: "probably is a strong opinion. We are saying that the evidence points rather strongly toward the individual being the author of the writing. However, it falls short of being conclusive, and this again can be due to poor copies, limited known writing, et cetera."

4

deed in 2005 and said "that it was an older black gentleman that was in front of her at the time of the notary signing." According to appellant, Porter showed her a California driver's license. Appellant notarized the document at an office that "was a combination of businesses. It was Mr. Fabian's business, First InterBank Mortgage, and it was . . . Rowan and Associates." She claimed she lost the notary journal documenting the transaction when she moved to her current office location.[6] When Ash was at Rowan and Associates, he saw appellant come into the office, but appellant left the office before Ash could speak with her.

*The Charges, Verdict, and Sentencing*

A grand jury returned a 17-count indictment against appellant Strong, Frazier, and Fabian. The operative indictment charged appellant with forgery (§ 470, subd. (c)) and filing a false or forged instrument (§ 115, subd. (a)). At some point, Strong "pled to [the] charges" and was severed from the case. The jury found Frazier and Fabian guilty of the counts charged against them. The jury also found appellant guilty of forgery (§ 470, subd. (c)) and filing a false or forged instrument (§ 115, subd. (a)). The court placed appellant on probation and she timely appealed.

DISCUSSION

"'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.]' [Citation.] . . . 'Our inquiry on appeal "in light of the whole record [is] whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." [Citations.] The standard of review is the same when the People rely mainly on circumstantial evidence. [Citations.]' [Citation.]'" (*People v. Battle* (2011) 198 Cal.App.4th 50, 61-62; see also

---

[6] The parties stipulated appellant reported the loss of the relevant notary journals to the Secretary of State in July 2005.

*People v. Pugh* (2002) 104 Cal.App.4th 66, 72 (*Pugh*) [sufficient evidence supported forgery conviction under section 470, subdivision (d)].)

I.

*Sufficient Evidence Supports Appellant's Forgery Conviction*

"Forgery has three elements: a writing or other subject of forgery, the false making of the writing, and intent to defraud."[7] (*People v. Gaul-Alexander* (1995) 32 Cal.App.4th 735, 741.) "An intent to defraud is an intent to deceive another person for the purpose of gaining a material advantage over that person or to induce that person to part with property or alter that person's position by some false statement or false representation of fact, wrongful concealment or suppression of the truth or by any artifice or act designed to deceive." (*Pugh, supra,* 104 Cal.App.4th at p. 72.) Intent to defraud "may be inferred from circumstantial evidence, e.g., the fact of the unauthorized signing, . . . false or evasive explanations, or other similar offenses." (2 Witkin & Epstein, Cal. Criminal Law (4th ed. 2012) Crimes Against Property, § 176, p. 224.)

Appellant contends her forgery conviction must be reversed "because there is insufficient evidence that she intended to defraud anyone." She contends she notarized the deed as a favor to Fabian, without knowing about Frazier and Fabian's scheme to obtain title to the house. She admits she "was negligent in performing her duties as a notary by not observing someone sign the document," but she claims there is no evidence "she intended to defraud anyone."

This argument — based on an interpretation of the evidence in a light most favorable to appellant — fails. The evidence established appellant: (1) had a longstanding relationship with Fabian and Rowan and Associates and was inferentially familiar with Fabian's handwriting; (2) notarized a fraudulent deed; (3) was presented with an obviously fake driver's license when she notarized the deed, assuming the driver's license existed when the deed was notarized; (4) tried to cover up the crime by

_____

[7] Section 470, subdivision (c) provides: "Every person who, with the intent to defraud, alters, corrupts, or falsifies any record of any . . . conveyance, or other instrument, the record of which is by law evidence, or any record of any judgment of a court or the return of any officer to any process of any court, is guilty of forgery."

claiming the notary journal documenting the transaction was somehow lost when the falsity of the deed and the driver's license were apparent to the suspicious title company's corporate headquarters; and (5) avoided meeting with Ash in person after realizing he was investing the crime.

Because Porter was dead when appellant notarized the deed, appellant either notarized a deed as to which no seller appeared before her, or notarized a deed as to which Fabian appeared and signed before her. Either way, the deed was fraudulent. From this evidence and the evidence discussed above, the jury could easily conclude appellant aided and abetted a forgery and possessed the requisite intent to defraud when she notarized the deed. (See *Pugh, supra*, 104 Cal.App.4th at p. 72 [evidence sufficient to support finding that defendant prepared a document with intent to defraud]; *People v. Martinez* (2005) 127 Cal.App.4th 1156 [defendant's inconsistent statements and other admissions supported conclusion he intended to defraud when he attempted to cash a stolen and forged check].) Sufficient evidence therefore supports appellant's forgery conviction.

## II.

### *Sufficient Evidence Supports Appellant's Conviction for Filing a False or Forged Instrument*

Appellant contends sufficient evidence does not support her conviction for filing a false or forged instrument in violation of section 115, subdivision (a) because she did not know "Porter's signature on the deed was not genuine."[8] We are not persuaded. As discussed above, the evidence demonstrated appellant knew Porter did not sign the deed. (See *Generes v. Justice Court* (1980) 106 Cal.App.3d 678, 681 [deed conveying an easement to defendant over land she did not own was clearly "false" under section 115].)

---

[8] Section 115, subdivision (a) provides: "Every person who knowingly procures or offers any false or forged instrument to be filed, registered, or recorded in any public office within this state, which instrument, if genuine, might be filed, registered, or recorded under any law of this state or of the United States, is guilty of a felony."

7

Accordingly, sufficient evidence supports appellant's conviction for violating section 115.

DISPOSITION

The judgment is affirmed.


                                             _____

                                             Jones, P.J.


We concur:


_____

Simons, J.


_____

Needham, J.