Filed 5/28/14  P. v. Kumar CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>NARINDER KUMAR,<br><br>    Defendant and Appellant. | F065487<br><br>(Super. Ct. No. BF130458A)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  David R. Lampe, Judge.

Jeffrey S. Kross, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Michael P. Farrell, Assistant Attorney General, Catherine Chatman and Julie A. Hokans, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Defendant Narinder Kumar armed himself with two knives and attacked Moti Lal, who was his brother, and Balwinder Singh, his brother's business partner.  Kumar stabbed Lal and Singh many times, killing both men.  He was convicted of two counts of

first degree murder and one count of assault with a deadly weapon on a third man.  The court imposed two counts of life without the possibility of parole, plus five years.

Kumar now maintains that there was insufficient evidence to support the conviction of the count alleging assault with a deadly weapon.  He also argues that the court improperly imposed a parole revocation restitution fine and that there is a clerical error in the abstract of judgment.  The People agree regarding the clerical error.  We will order the error corrected and otherwise affirm the judgment.

### FACTS AND PROCEDURAL HISTORY

The district attorney filed an information charging Kumar with three counts: (1) premeditated murder of Lal (Pen. Code, § 187, subd. (a)[1]); (2) premeditated murder of Singh (*ibid.*); and (3) assault with a deadly weapon against the third man, Meeka Mander (§ 245, subd. (a)(1)).  A multiple-murder special circumstance was alleged for counts 1 and 2.  (§ 190.2, subd. (a)(3).)  For all counts, personal use of a deadly weapon, namely a knife, was alleged.  (§ 12022, subd. (b)(1).)

At trial, Gurpal Singh Dhillon testified that Lal and Singh were partners in GMB Ice Cream Warehouse.  Dhillon was a partner of Lal and Singh's in another business.  Dhillon was also an ice cream truck driver and bought his ice cream from GMB Ice Cream Warehouse.  Kumar was an ice cream truck driver as well.  He complained to Dhillon about his brother's business practices and sometimes tried to persuade Dhillon to join him in launching a venture that would undersell GMB Ice Cream Warehouse.  Kumar frequently told Dhillon, in an angry tone, that he had done much for Lal and Singh in India, but they had done nothing for him in the United States.  Dhillon finally asked Kumar not to speak ill of his partners, and Kumar apologized.

---

[1]Subsequent statutory references are to the Penal Code unless noted otherwise.

Dhillon testified that on December 25, 2009, at about 11:30 a.m., he was standing outside the ice cream warehouse with Lal, Singh, and Mander when Kumar drove up in his ice cream truck and walked inside. Lal went inside and Dhillon drove off in his truck.

Mander remained outside talking with Singh. He testified that he soon heard screams from inside. Singh ran in and Mander followed at a distance. Inside, Mander saw Singh and Lal each restraining one of Kumar's arms. Lal had a cut on his face and Kumar had a knife in his hand. Singh yelled, "[H]e's killing. He's killing. He's going to kill." Lal and Singh urged Mander to take the knife from Kumar. Mander "snatched the knife from him." As he did so, Kumar was "holding onto it very tight ...." As he took the knife, Mander received a cut on the ring finger of his right hand. Mander and Lal stepped away from Kumar. Mander threw the knife down among some wooden pallets. Then Singh screamed, "[H]e has killed me. He has killed me." Mander looked back and saw Kumar stabbing Singh with another knife. Mander got scared and ran outside, where he called 911.

Dhillon, who had stopped at a gas station, received a cell phone call from Lal. Lal was crying in pain, but did not respond when Dhillon spoke to him. Dhillon hung up and tried to call Lal back, but Lal did not answer.

The police received a 911 call from Lal, a recording of which was played for the jury. After Lal told the operator there had been a stabbing and he needed an ambulance and the police, the confrontation between Kumar and Lal was heard continuing in Punjabi in the background:

"Kumar: *Go ahead, dog, call the police!*

"Lal: *Ah, I'm dying!*

"[Operator]: Sir?

"Lal: *What did I ever do wrong to you?? Tell me!*

"Kumar: *Sister-f___er! What did you ever do for me?*

3.

"Lal: *What did I ever do wrong?*

"[Operator]: Sir? Hello. Oh … 27 bravo four.

"Lal: *Inaudible.*

"[Operator]: It didn't dump, I'm sorry. Hello? Hello?

"Lal: *Inaudible. What did I do?*

"[Operator]: Sir? Hello?

"Kumar: *Inaudible.*

"Lal: *(Inaudible) Now I'm dead!*

"[Operator]: Hello?

"Lal: *Inaudible.*

"Kumar: *You're not dead yet!*

"Lal: *Why are you killing me? At least I should know why you are doing this!*

"Kumar: *You 'sister's vagina!'* [Punjabi expletive.] *What <u>didn't</u> you do!?*

"Lal: *What did I do? Tell me?*

"[Operator]: Sir? Hello? Hello?

"Lal: *I'm already dead; why are you still stabbing me?*

"[Operator]: Hello, sir? Hello?

"Lal: *I'm dying! Stop now … Dying ….*

"Kumar: *You're not dead yet!*

"Lal: *I'm dying ….*

"[Operator]: Sir …? Hello …? Hello …?"

Police arrived at the warehouse and found Kumar, has hands and clothes covered in blood, in the parking lot. Officer Claude Brooks testified that as Kumar was being detained, he took a dagger sheath from his pants and threw it on the ground. Other

4.

officers entered the warehouse and found Lal and Singh motionless on the floor with stab wounds. One bloody knife was on the floor beside Singh and another was on top of some pallets.

A forensic pathologist testified about the autopsies he performed on Lal and Singh. Singh had nine knife wounds on his head and neck, one on his chest, three on his back, and two on his hand. His death was caused by multiple stab wounds. Lal had 33 knife wounds on his back and the back of his neck, 16 on his hands and arms, 11 on his head and the front of his neck, 10 on his abdomen, and 8 on his chest. His death also was caused by multiple stab wounds.

The jury was shown a recording of a television news interview Kumar gave while in jail. During the interview, Kumar said, "If I get the death penalty, so be it." Asked whether he was sorry, Kumar replied, "Obviously I am because it's my brother … Singh came to stop it and pulled the knife from my hand … then I pulled the other knife out. The partner came and I hit him. There's nobody else to blame."

In an effort to show that the killings were not murder but instead voluntary manslaughter because of a mental disease or disorder, the defense presented medical testimony by Dr. Joseph Wu, a professor of medicine and director of the Brain Imaging Center at the University of California at Irvine. Dr. Wu testified that he ordered a positron emission tomography (PET) scan of Kumar's brain. The scan showed that the activity in the temporal lobes of Kumar's brain was "massively asymmetrical," with the left temporal lobe much less active than the right temporal lobe. Further, the activity of the left striatum of Kumar's brain was "almost entirely wiped out," his occipital lobe was damaged, and the ratio of activity between the cerebral cortex and the cerebellum was below normal. Dr. Wu testified that these results were indicative of a traumatic injury to the brain, resulting in extensive brain damage. The results were "among the more severe abnormalities" Dr. Wu had seen in his career. The injury was to areas of the brain, especially the temporal lobe, involved with emotional processing and aggression and

5.

anger functions. It would tend to interfere with the accurate perception of reality and lead to overreactions to slight provocations or insults. These overreactions could include an outburst of violence, such as stabbing someone many times.

Dr. Wu had been informed that Kumar had been in a motorcycle accident in the mid- to late-1990's. He opined that the damage revealed by the PET scan was consistent with an injury sustained during that period, and that it would be possible for a person with Kumar's type of brain injury to function for that length of time after the injury, except under conditions of stress requiring emotional control. He also opined that it was not surprising that Kumar did not report any recollection of the accident, as people who suffer brain injuries often do not recall being hurt.

Dr. Wu testified about some of the contents of a report by Dr. Eugene Couture, a psychologist who evaluated Kumar. Dr. Wu reviewed this report after analyzing the PET scan results in order to correlate those results with other facts in Kumar's medical history. According to the report, Kumar told Dr. Couture that he had a history of disagreements with Lal and Singh over Kumar competing with GMB Ice Cream Warehouse by buying products from other suppliers and reselling them at lower prices. Someone had threatened to shoot Kumar. Kumar was unwilling to go to the police because he had a pending asylum request with the immigration authorities and Singh said he would have Kumar deported. When Kumar went to the warehouse on December 25, 2009, he believed Lal and Singh were going to beat him up and he armed himself with two knives in order to defend himself. He said he stabbed Lal and Singh because he believed he was going to be assaulted.

The prosecution presented Dr. Couture as a rebuttal witness. Dr. Couture interviewed Kumar, conducted a mental status evaluation and a cognitive screening, and administered a small number of psychological tests. He concluded that, although Kumar was not of high intelligence, he was "able to run his own life," had "no diagnosable mental disorder," had no cognitive status problems, and was competent to stand trial.

Kumar told Dr. Couture he had never had any kind of traumatic head injury, had no previous contacts with the mental health system, and had never taken any psychiatric medications or felt any need to take them. Based on Kumar's own reports, Dr. Couture saw no indication that Kumar had any problem managing anger. Dr. Couture did not order any brain scans.

The jury found Kumar guilty as charged, finding the two murders to be in the first degree. It also found the multiple-murder and weapon-use allegations true.

The court imposed consecutive sentences of life without the possibility of parole, plus one year each for the weapon enhancement, on counts 1 and 2. On count 3, the court imposed the lower term of two years plus one year for the weapon enhancement.

### *DISCUSSION*

### I.      *Sufficiency of evidence of assault with a deadly weapon*

Kumar contends that the evidence was not sufficient to prove count 3, assault upon Mander with a knife. Specifically, he argues the evidence did not establish that he engaged in any willful act that could constitute that offense. In his view, the evidence showed only that Mander took the knife away from him and got cut in the process.

The standard of review for a challenge to the sufficiency of the evidence supporting a conviction is well-established:

> "'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.… We presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] A reviewing court neither reweighs evidence nor reevaluates a witness's credibility. [Citation.]' [Citation.]" (*People v. D'Arcy* (2010) 48 Cal.4th 257, 293.)

Mander's testimony was that, as Lal and Singh held Kumar's arms, Kumar grasped the knife tightly as Mander struggled with Kumar to disarm him. The evidence established that Kumar committed stabbings both before (when he wounded Lal's face) and after (when he killed the victims) this struggle. Given this context, the jury could reasonably infer that Kumar's intent was not merely to retain his grasp on the knife, but to fight back against Mander in order to continue his onslaught. In light of that intent, the jury could reasonably make the further inference that, as Kumar struggled, he intentionally acted to resist Mander with at least the mental state necessary for assault: "actual knowledge of those facts sufficient to establish that the act by its nature will probably and directly result in the application of physical force against another." (*People v. Williams* (2001) 26 Cal.4th 779, 790.) Accordingly, we conclude that the evidence was sufficient to prove that Kumar committed a willful act supporting the conviction of assault with a deadly weapon.

## II.   *Parole revocation restitution fine*

As part of the sentence, the court imposed and suspended a parole revocation restitution fine of $240. (§ 1202.45.) Kumar maintains that this fine was unauthorized because his sentence precludes the possibility of parole. As we will explain, our Supreme Court has held otherwise in the same type of situation.

In *People v. Brasure* (2008) 42 Cal.4th 1037, the defendant was sentenced to death and also to a determinate term of two years eight months. (*Id.* at p. 1049.) The trial court imposed and suspended a parole revocation restitution fine under section 1202.45. The Supreme Court rejected the defendant's argument that the fine should not have been imposed because his sentence precluded parole. It stated that the determinate term carried a parole term by law (i.e., § 3000, subd. (a)(1)) and that every such sentence is subject to a parole revocation restitution fine by the terms of section 1202.45. Although it was unlikely the defendant would ever serve any of the

8.

parole period, the imposition of the fine could not prejudice the defendant because it was suspended. (*People v. Brasure, supra,* at p. 1075.)

The Supreme Court distinguished *People v. Oganesyan* (1999) 70 Cal.App.4th 1178, on which Kumar relies. There, the defendant was sentenced to life without parole, a 10-year firearm enhancement, and an indeterminate term of 25 years to life. (*Id.* at p. 1181.) The Court of Appeal held that, because the sentence did not allow for any term of parole, the trial court did not err when it declined to impose a parole revocation restitution fine. (*Id.* at pp. 1183-1184.) The Supreme Court stated that *Oganesyan* did not conflict with its holding because no determinate term was included in the base sentences in that case, so no parole term was mandated for any sentence. (*People v. Brasure, supra,* 42 Cal.4th at p. 1075.)

*People v. Battle* (2011) 198 Cal.App.4th 50, on which Kumar also relies, is indistinguishable from *Oganesyan.* Like Oganesyan and unlike Kumar, Battle received no determinate term. (*People v. Battle, supra,* at p. 58.) Therefore, in light of the Supreme Court's discussion in *Brasure*, *Battle* does not support Kumar's position.

### III.    *Clerical error*

The court imposed one-year enhancements for personal use of a knife on each of the three counts. The parties agree that the abstract of judgment erroneously labels these enhancements as applying to counts 1, 2, and 2. We will order the error corrected.

### *DISPOSITION*

The trial court is directed to amend the abstract of judgment to show that the court imposed one-year enhancements pursuant to section 12022, subdivision (b)(1), on each of counts 1, 2, and 3, rather than one enhancement on count 1, two on count 2 and none on

count 3.  The trial court will forward the amended abstract to the appropriate correctional authorities.  The judgment is affirmed in all other respects.

_____
Sarkisian, J.\*

WE CONCUR:


_____
Poochigian, Acting P.J.


_____
Peña, J.

---

\*Judge of the Superior Court of Fresno County, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.