Filed 1/12/21  P. v. Fletcher CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

|  |  |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>KYLE BILLY FLETCHER,<br><br>Defendant and Appellant. | C087837<br><br>(Super. Ct. No. 15F02336) |

A jury convicted defendant Kyle Billy Fletcher of first degree murder, possessing methamphetamine for sale, and transporting methamphetamine for sale.  The jury further found that defendant personally used a deadly or dangerous weapon (a belt) to commit the murder.  The trial court sentenced defendant to 25 years to life for the murder, a consecutive one year for use of a deadly or dangerous weapon, a consecutive three years for the transportation offense, and two years (stayed) for the possession offense.  The trial court also ordered defendant to pay various fines, fees and assessments.

Defendant now contends (1) the belt found around the naked and lifeless victim's neck was part of a sex act gone wrong and thus there is insufficient evidence defendant committed first degree murder; (2) the prosecutor utilized an inappropriate analogy during closing argument that reduced the People's burden of proof, and defendant's trial counsel was ineffective in failing to object; and (3) because the sentence on the possession conviction was stayed, the criminal laboratory analysis fee and associated

1

penalties and assessments imposed on that conviction must also be stayed. We disagree with the first two contentions but agree with the third, as do the People. We will affirm the judgment except for the criminal laboratory analysis fee and associated penalties and assessments imposed on the possession conviction and remand the matter to the trial court with directions to stay the criminal laboratory analysis fee and to recalculate and stay the associated penalties and assessments in a manner consistent with this opinion.

BACKGROUND

A

Defendant had given the victim Daniel Aiello a body piercing and for years thereafter would visit Aiello to "hang out and get high" and to engage in certain sexual acts for which Aiello paid defendant, such as urinating into Aiello's mouth, holding a chain leash around Aiello's neck, walking Aiello like a dog, beating Aiello, and walking on Aiello's back while Aiello would "hump" the ground.

When Aiello started a moped business, he moved into a room in the rear of the shop and invited defendant to be a co-owner. Defendant provided the tools, the surveillance system, and his time and knowledge. However, the relationship became increasingly strained. Aiello accused defendant in text messages of being a lazy, unreliable, shady and incompetent business partner while conceding that defendant was physically stunning and of unsurpassed beauty. In other text messages Aiello accused defendant of owing him money and misusing business funds.

A text message sent by Aiello in March 2015 threatened that Aiello would contact defendant's probation officer. The next month Aiello told defendant he had filed a police report alleging defendant had committed financial crimes.

Then, in a series of text messages the day before his death, Aiello demanded that defendant come to the shop and return money and property belonging to the business. That afternoon, Aiello told his upstairs neighbor he was going out of town and if the neighbor saw defendant at the business, the neighbor had permission to call 911. Around

2

3:00 a.m. on April 15, 2015, the upstairs neighbor heard loud noises below her apartment that sounded like a struggle. The neighbor saw a car outside her window that she associated with defendant, which alarmed her given what Aiello had mentioned to her earlier. The neighbor called Aiello's cell phone, and when he did not answer, the neighbor called 911.

Surveillance footage captured defendant arriving in a vehicle and knocking on the door of the moped shop around 1:45 a.m. on April 15, 2015. The footage showed that for about another hour, defendant and Aiello were inside the shop together, moving between the back room and the front of the shop. At times defendant appeared to be looking for something with his cell phone flashlight.

According to an officer who testified at trial, Aiello last appeared in the surveillance footage at 2:58 a.m. Between 2:58 a.m. and 3:09 a.m., defendant came and went and did not appear to be doing anything different than he had done before. Defendant next appeared in the footage at 3:17 a.m., a few moments after phone records indicated Aiello's upstairs neighbor called Aiello's phone. The footage captured defendant apparently talking on a cell phone while holding a second cell phone. The video footage ended at 3:21 a.m. when defendant disconnected the surveillance equipment, which he claimed was his property.

Police arrived at 3:30 a.m. and saw defendant walking out of the moped shop with a television. Defendant said he was a partial owner of the business, he was just removing some items, and his partner was in the back. Police found Aiello in the back room, naked and face down, with a belt around his neck. The belt was snug around Aiello's neck but it was not buckled. A woman was with defendant when the police arrived and she had Aiello's cell phone. Police found photographs of Aiello on defendant's cell phone, along with a video of Aiello naked on all fours with a person urinating into his mouth. Inside the car defendant had arrived in, police found 45 grams of methamphetamine in multiple packages.

3

B

Defendant testified to the following version of events at trial.  He said he went to the moped shop with his girlfriend on the morning in question, planning to show Aiello that he still had the money Aiello had given him and had not misused it.  He also planned to end his relationship with Aiello and retrieve some of his personal property from the shop, including the surveillance equipment and television.

According to defendant, he showed the money to Aiello and Aiello said not to worry about it.  Defendant and Aiello then looked around the shop for the electronic equipment the pair had purchased.  But Aiello tried to get defendant to entertain his sexual fantasies and to get high.  Over the next hour, every time Aiello went to the back room, he consumed a dose of the drug "GHB."

Defendant testified that at some point he went to the back room and found Aiello naked with a belt around his neck.  Aiello handed the end of the belt to defendant and said "be my master."  Defendant walked Aiello like a dog, and when Aiello got down on his stomach, defendant let go of the belt and walked on Aiello's back.  Defendant said he and Aiello made a lot of noise.  According to defendant, he stood on Aiello's shoulders while Aiello humped the floor; then Aiello sat up like a dog and handed the belt back to defendant while Aiello masturbated himself.  Defendant said Aiello was leaning forward on his knees while defendant held the belt.

Defendant claimed that after a little bit of time, Aiello jerked and thrusted.  Defendant set him down and Aiello began to snore.  According to defendant, this was not uncommon; many times before, after consuming narcotics, Aiello would pass out and snore.  Believing Aiello was asleep, defendant went about the shop picking up the items he had come for, including the surveillance equipment and television.  Defendant said his girlfriend entered the shop while Aiello was asleep to help defendant look for his personal items by illuminating parts of the shop with Aiello's cell phone light.  Defendant

4

explained that his own cell phone light would not turn on due to a low battery. Defendant insisted he did not intend to kill Aiello.

C

Defendant admitted at trial that he never told police the version of events he offered at trial. Instead, defendant said he told police scenarios of what could have happened but did not actually happen because he was embarrassed and scared.

When the prosecutor asked him why the version he provided at trial was more embarrassing than the information he provided to police, defendant said he did not think anybody would believe him. The prosecutor also asked defendant why he originally denied knowing that Aiello engaged in auto-erotic asphyxiation. Defendant replied that he did not remember and that he was not too familiar with those words.

D

Dr. Brian Nagao, the forensic pathologist who performed Aiello's autopsy, said there were ligature marks on Aiello's neck consistent with strangulation, and hemorrhages on Aiello's back consistent with someone standing on his back and applying pressure while pulling on a ligature around the neck. Dr. Nagao said it would take four to six minutes of continuous neck pressure to cause death by asphyxia, but the victim would typically become unconscious after approximately 15 seconds of strangulation. Although Aiello's blood contained methamphetamine and GHB, both of which could cause death, Dr. Nagao opined that Aiello died from strangulation. On cross-examination, Dr. Nagao agreed that sometimes a person can die accidentally when using a ligature to compress their neck while masturbating.

Defendant's expert forensic pathologist, Dr. Curtis Rollins, testified that while ligature strangulation was the cause of death, the methamphetamine and GHB in Aiello's blood were significant contributing factors. He said death by ligature strangulation occurs within two to three minutes.

5

Dr. Rollins explained that a person may develop a tolerance to auto-erotic asphyxiation such that it takes longer to feel the desired arousal effect. He said effective auto-erotic asphyxiation involves a release mechanism so that if the person loses consciousness they do not die. On cross-examination, Dr. Rollins agreed that a person pulling against a belt tied around their neck while on their knees, without more, could not produce the injuries the victim had to his neck.

E

In closing argument, the prosecutor stated:

"Now, [first] degree murder is outlined in the jury instructions. It explains that all murder that is perpetrated with willful -- that is willful, deliberate, and premeditation is that of [first] degree. [¶] . . . [¶] And deliberate means formed or arrived at or determined upon as a result of careful thought and weighing of consideration for and against the proposed course of action. [¶] . . . [¶] Now, it will go on to tell you that it's not measured in units of time. The time of reflection will vary with different people under varying circumstances. . . . The true test is not duration of time but the extent of the reflection. And it's important to remember that a cold, calculated judgment can be formed in a short period of time. That is what the instructions read. Well, what does that mean? It means this: I don't think that originally when the defendant went to Mr. Aiello's house -- when he went to his shop and when he drove from Chico, I don't think he thought, [']You know, what? I am going to stop by and kill Mr. Aiello.' He probably thought, 'I am going to confront him about this police report and try to smooth things out because I ain't going back to jail. That's not happening.'

"[¶] . . . [¶]

"So at some point . . . defendant made the conscious decision to kill Mr. Aiello. . . . [W]e know . . . just how Mr. Aiello died. He died over a period of time, several minutes, with that belt being pulled around his neck.

"[¶] . . . [¶]

6

"Now . . . measuring units of time and talking about duration, you know, it's -- it's difficult sometimes to talk about premeditation and deliberation. But not time -- but the reflection is the important part. And so what I'm going to give you is an analogy. You are going to hear a couple of analogies.

"So I have committed a crime in my life. I have run a red light; okay? . . . I was driving, and I knew this light was a very long cycle, and I knew that I was going to be sitting there for a long time. And so the light turned yellow, and I immediately started doing the time/distance calculations and going, 'I'm not going to make this, but I can make it before any other car comes from their green light.[']

"And so I look to see how many cars are on each side, and I keep my foot on the accelerator. I look in my rearview mirror to make sure that there is no cop behind me. And I look forward and scan to see if there is any cops in front of me, and then I pass through and I get through the intersection. And I immediately say, 'Darn it. I shouldn't have done that. That was a bad idea.'

"But that red light running was very short in duration, so it was a cold, calculated decision because I did a lot of things. I checked my rear view mirror for cops. I checked in front of me for officers. I looked both ways to see if it was safe for me to pass through it. And I make the conscious decision to keep my foot on the accelerator and not ease off and just brake like I should.

"I can say I was a younger man and I no longer do that, but it's a good analogy on the reflection that goes in in making a very, very horrible decision.

"And that's what the defendant did. When he put his foot on the back of Mr. Aiello and pulled and pulled and pulled, it didn't even take the seconds that it took a light to turn red. It took minutes for this man to die. And so he at any time could have taken that foot off the accelerator, but he didn't. That's why this is [first] degree murder."

Defense counsel countered in closing argument that defendant displayed criminal negligence and therefore was guilty of involuntary manslaughter but not murder.

7

Disagreeing with the prosecutor's red-light analogy, defense counsel argued Aiello died because of a sex act that went sour; defendant did not intend to kill him.

The trial court read to the jury CALCRIM No. 520, which explained that if the jury found defendant committed murder, "it [was] murder of the second degree, unless the People . . . proved beyond a reasonable doubt that it [was] murder of the first degree as defined in [i]nstruction 521."

The trial court then read to the jury CALCRIM No. 521, which provides, in relevant part:

"The defendant is guilty of first degree murder if the People have proved that he acted willfully, deliberately, and with premeditation. . . .

". . . The length of time the person spends considering whether to kill does not alone determine whether the killing is deliberate and premeditated. The amount of time required for deliberation and premeditation may vary from person to person and according to the circumstances. [¶] A decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated. On the other hand, a cold, calculated decision to kill can be reached quickly. The test is the extent of the reflection, not the length of time."

F

The jury found defendant guilty of first degree murder (Pen. Code, § 187 -- count one), possessing methamphetamine for sale (Health & Saf. Code, § 11378 -- count two), and transporting methamphetamine for sale (Health & Saf. Code, § 11379, subd. (a) -- count three). The jury further found that defendant personally used a deadly or dangerous weapon (a belt) to commit the murder within the meaning of Penal Code section 12022, subdivision (b)(1).

The trial court sentenced defendant to 25 years to life for the murder, plus a consecutive one year for use of a deadly or dangerous weapon. The trial court also imposed a consecutive three years on the count three conviction for transporting

8

methamphetamine for sale, and two years on the count two conviction for possessing methamphetamine for sale (stayed pursuant to Penal Code section 654).

The trial court imposed various fines, fees and assessments, including a $50 laboratory fee for each of the two drug convictions (for a total of $100), and by reference to a probation officer's calculations in a presentencing memorandum, $260 in further assessments, some of which were based on the laboratory fees.

DISCUSSION

I

Defendant contends there is insufficient evidence he committed first degree murder. Citing *People v. Anderson* (1968) 70 Cal.2d 15, he claims there is not enough evidence he planned the murder or had a motive to kill, or that the manner of killing showed a preconceived design.

A

"A verdict of deliberate and premeditated first degree murder requires more than a showing of intent to kill. ([Pen. Code, ]§ 189.) 'Deliberation' refers to careful weighing of considerations in forming a course of action; 'premeditation' means thought over in advance. [Citations.] 'The process of premeditation and deliberation does not require any extended period of time. "The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly . . . ." [Citations.]' [Citation.]" (*People v. Koontz* (2002) 27 Cal.4th 1041, 1080 (*Koontz*).)

As the California Supreme Court reiterated in *Koontz*, the court in *Anderson* identified three factors commonly present in cases of premeditated murder: (1) facts about what defendant did prior to the killing which show planning activity; (2) facts about the defendant's prior relationship and/or conduct with the victim from which the jury could reasonably infer a motive to kill the victim; (3) and facts about the manner of killing from which a jury could infer a preconceived design. (*Koontz, supra*, 27 Cal.4th

9

at p. 1081.)  The Supreme Court cautioned, however, that unreflective reliance on *Anderson* for a definition of premeditation is inappropriate.  " 'The *Anderson* factors, while helpful for purposes of review, are not a sine qua non to finding first degree premeditated murder, nor are they exclusive.' " (*Koontz, supra*, 27 Cal.4th at p. 1081.)

" 'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence -- that is, evidence that is reasonable, credible, and of solid value -- from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.  [Citation.]' (*People v. Lindberg* (2008) 45 Cal.4th 1, 27.)" (*People v. Battle* (2011) 198 Cal.App.4th 50, 61-62 (*Battle*).)

"A judgment challenged on appeal is presumed correct, and it is the appellant's burden to affirmatively demonstrate error.  [Citation.]  Thus, when a criminal defendant claims insufficiency of the evidence on a particular element of the crime of which he was convicted, we presume the evidence of that element was sufficient, and the defendant bears the burden of convincing us otherwise.  To do so, the defendant must present his case to us in a manner consistent with the substantial evidence standard of review.  That is, the defendant must set forth in his opening brief all of the material evidence on the disputed element in the light most favorable to the prosecution, and then must persuade us that that evidence cannot reasonably support the jury's verdict.  [Citation.]" (*Battle, supra*, 198 Cal.App.4th at p. 62.)

B

Defendant acknowledges premeditation and deliberation can be inferred where there is evidence a defendant uses a ligature to apply constant force to the neck of a victim for many minutes.  But he insists the evidence refutes such an inference because Aiello was strangled by a belt looped around his neck like a noose which remained tight due to a ratchet effect even when the other end of the belt was released.

10

Defendant does not provide citations to the record to support his noose and ratchet-effect theory. And we found no support in our own review of the record. Although a detective described the belt as "fairly tight" and "snug," it was not described as a noose with a ratchet effect. Because the factual underpinnings of defendant's argument are unsupported, the argument fails.

Rather, based on our review of the record, we conclude the jury reasonably could have determined Aiello died because defendant stood on Aiello's back and forcefully and continuously pulled on the belt tied around Aiello's neck for several minutes. There is substantial evidence of premeditation and deliberation, and therefore substantial evidence for the jury's first degree murder finding.

The record indicates defendant had motive because Aiello was accusing him of criminal activity and was demanding that defendant return money and property. As for the manner of killing, defendant admitted providing a different version of events at trial. But both parties' experts testified Aiello died from strangulation, and they agreed death would have resulted after several minutes of continued strangulation. Given that evidence, the jury reasonably could have found that defendant had ample time to consider the deadly nature of his conduct as he pulled the belt tightly against Aiello's neck. (See *People v. Hovarter* (2008) 44 Cal.4th 983, 1019-1020 [evidence that the victim "was strangled with a rope and that her death from asphyxiation would have taken between five and eight minutes" permitted a rational factfinder to infer that the manner of killing demonstrated deliberation, as such a "prolonged manner of taking a person's life, which requires an offender to apply constant force to the neck of the victim, affords ample time for the offender to consider the nature of his deadly act"]; *People v. Davis* (1995) 10 Cal.4th 463, 510 [sufficient evidence of premeditation and deliberation for first degree murder where, among other facts, defendant strangled the victim for "over a period of up to five minutes" (italics omitted)].)

11

Defendant next asserts the prosecutor's traffic-light analogy misstated the standard required for premeditation and deliberation, reducing the People's burden of proof. He further argues his trial counsel was ineffective in failing to object.

" '[T]o establish reversible prosecutorial misconduct a defendant must show that the prosecutor used " 'deceptive or reprehensible methods' " and that it is reasonably probable that, without such misconduct, an outcome more favorable to the defendant would have resulted. [Citation]' . . . A prosecutor has wide latitude during closing argument to make assertions of common knowledge or use illustrations based on common experience. [Citations.] But in relating the jury's task to a more common experience, the prosecutor 'must not imply that the task is less rigorous than the law requires.' " (*People v. Wang* (2020) 46 Cal.App.5th 1055, 1085 (*Wang*).)

" 'When attacking the prosecutor's remarks to the jury, the defendant must show that, "[i]n the context of the whole argument and the instructions" [citation], there was "a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. [Citations.] In conducting this inquiry, we 'do not lightly infer' that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements." ' [Citations.]" (*Wang, supra*, 46 Cal.App.5th at p. 1085.)

In *Wang*, the Second Appellate District, Division Two, confronted a scenario very similar to the instant case and ruled that the prosecutor's closing argument was not improper. In closing argument in a first degree murder trial, the prosecutor "illustrate[d] the elements of premeditation and deliberation by analogizing them to a driver's decisionmaking process in choosing whether to drive through a yellow traffic light or stop suddenly. The prosecutor explained, 'You have a decision to make, "do I step on the accelerator and fly through this intersection because I can't wait, or do I slam on my brakes and stop?" You have to decide, and when you're making that decision -- do I go or do I stop -- you're evaluating things. "If I go, are there pedestrians? Is there a cop

around?  Am I going to get a ticket?" . . .  This happens so quickly.  It happens so quickly, but in your mind, you quickly evaluate those things, and you decide and you act.  That is premeditation and deliberation.' " (*Wang*, *supra*, 46 Cal.App.5th at p. 1084.)

The closing argument was not improper, the court ruled, because, when "[v]iewed in the context of the prosecutor's whole argument," . . . [t]he prosecutor used the traffic light illustration to explain the concept of premeditation and deliberation as a weighing of options that can happen very quickly.  [Citations.]  The illustration was consistent with the law." (*Wang, supra*, 46 Cal.App.5th at p. 1085.)

And, *Wang* continued, the illustration was consistent with *People v. Avila* (2009) 46 Cal.4th 680, 715, wherein the California Supreme Court did not accept the defendant's argument that the prosecutor equated deciding to commit murder with deciding whether to stop at a yellow light.  (*Wang*, *supra*, 46 Cal.App.5th at p. 1086.)  *Wang* explained that in *Avila*, the California Supreme Court "upheld the prosecutor's argument that 'assessing one's distance from a traffic light, and the location of surrounding vehicles, when it appears the light will soon turn yellow and then red, and then determining based on this information whether to proceed through the intersection when the light does turn yellow, [was] an example of a "quick judgment" that is nonetheless "cold" and "calculated." ' " (*Wang, supra*, 46 Cal.App.5th at p. 1086.)

*Wang* rejected defendant's attempt to distinguish the closing argument in *Avila* (where the prosecutor told the jury that " ' "the decision to kill is similar, but . . . not . . . in any way . . . the same," ' ") from the closing argument at issue in *Wang,* which defendant characterized on appeal as " 'explicitly argu[ing] that the premeditation and deliberation required to drive through a yellow light [was] the *equivalent* of the premeditation and deliberation required for first-degree murder.' " (*Wang, supra*, 46 Cal.App.5th at p. 1086, italics added.)

*Wang* explained: "In the context of the argument it is apparent that the prosecutor did not equate the gravity of a decision to kill with a traffic decision, but used the

13

illustration to show that, like a decision to drive through a yellow light, a premeditated and deliberate decision to kill could be made very quickly." (*Wang, supra*, 46 Cal.App.5th at p. 1086.)

Here too, defendant seeks to draw a line between the prosecutor's comments in *Avila* and the prosecutor's comments here, arguing that the prosecutor here "suggest[ed] an equivalency between" the "premeditation and deliberation required for first degree murder" and "a driver's hurried decision to run a red light." But in reviewing the prosecutor's comments in this case, it is clear to us the prosecutor's challenged remarks were limited to the topic of "reflection" and did not equate first degree murder with a traffic violation. As the court in *Wang* explained, the prosecutor "used the illustration to show that, like a decision to drive through a [traffic] light, a premeditated and deliberate decision to kill could be made very quickly." (*Wang, supra*, 46 Cal.App.5th at p. 1086.)

Accordingly, the prosecutor's traffic light analogy was not improper, and defense counsel was not deficient in failing to object.

III

The parties agree that, because punishment was stayed as to count two pursuant to Penal Code section 654, the $50 laboratory fee and associated penalty assessments should have been stayed as well. The People take the position that $130 of the $260 of imposed assessments should be stayed.

While we agree with the parties that the criminal laboratory analysis fee for count two, imposed pursuant to Health and Safety Code section 11372.5, must be stayed (*People v. Sharret* (2011) 191 Cal.App.4th 859, 870), we make an observation that requires remand to the trial court for recalculation. The $260 in penalties and assessments that the trial court incorporated by reference from the probation officer's presentencing memorandum apparently included $50 pursuant to Government Code section 70373, even though (1) that provision mandates a fee of $30 per conviction, and (2) the trial court separately ordered, and the abstract of judgment reflects, imposition of

14

criminal conviction assessments pursuant to Government Code section 70373 for each of defendant's three convictions.  (See Gov. Code, § 70373, subd. (a)(1).)

Accordingly, we will remand the matter to the trial court to correctly calculate, impose, and stay the relevant fees and assessments, keeping in mind that the criminal conviction assessment pursuant to Government Code section 70373 is "not punitive in nature" and therefore should not be stayed even if the associated conviction is stayed. (*People v. Sencion* (2012) 211 Cal.App.4th 480, 484; see *id.* at pp. 483-483.)

DISPOSITION

The judgment is affirmed except for the Health and Safety Code section 11372.5 criminal laboratory analysis fee and the associated penalties and assessments imposed on the count two conviction for possessing methamphetamine for sale; as to those items, the matter is remanded with directions for the trial court to stay the criminal laboratory analysis fee and to recalculate and stay the associated penalties and assessments in a manner consistent with this opinion.  The trial court is further directed to amend the abstracts of judgment and to send certified copies of the amended abstracts to the Department of Corrections and Rehabilitation.

/S/
MAURO, J.

We concur:

/S/
RAYE, P. J.

/S/
BLEASE, J.

15