Filed 11/1/21  P. v. Flores CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).   This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B307423 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA146717) |
| v. | |
| HERBERT NIXON FLORES, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Connie R. Quiñones, Judge.  Affirmed.

Spolin Law and Aaron Spolin for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Michael C. Keller and Wyatt E. Bloomfield, Deputy Attorneys General, for Plaintiff and Respondent.

\* \* \* \* \* \* \* \* \* \*

Defendant and appellant Herbert Nixon Flores was sentenced to 40 years to life in prison for the shooting death of Everardo Soto. He contends the trial court committed evidentiary error by excluding impeachment of a prosecution witness, instructional error in failing to instruct the jury regarding accomplice testimony, and cumulative error.

Finding no reversible error, we affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

Defendant was charged, along with codefendants Santiago Ortega and Anthony Moreno, with one count of murder (Pen. Code, § 187, subd. (a); count 1) and one count of assault with a semiautomatic firearm (§ 245, subd. (b); count 2). Ortega and Moreno were also charged as accessories after the fact (neither codefendant is a party to this appeal). Gang and firearm use allegations were alleged as to both counts (§ 186.22, subd. (b)(1)(C), § 12022.53, subds. (b)–(e)(1), § 12022.5).

The charges arose from the fatal shooting of Everardo Soto on June 22, 2018. That morning, Maximiliano Estrada ran into Soto while he was running an errand. Soto was friends with Estrada's older brother and treated Estrada like he was his own brother. Estrada had several tattoos, including one that said "Watts" and three dots that stood for "my crazy life," but denied being a gang member.

Estrada and Soto were walking down Central Avenue when a car turned the corner and slowed down next to them. An adult male sitting in the front passenger seat "hit [them] up" (asked where they were from). Estrada knew asking where someone was from was a "gang thing." He was scared, tried not to look at them, and just kept walking.

After the front passenger asked a second time where they were from, Soto responded "Watts." By then the car had stopped and the driver (another adult male) got out. Estrada feared something bad was going to happen, so he ran into a nearby beauty salon. He heard four gunshots. When Estrada went back out to the street, he saw Soto on the ground, bleeding. Several people had gathered around. Someone told him not to touch Soto and that paramedics were on the way.

The police officers who responded to the scene found Soto lying unresponsive on the sidewalk with multiple gunshot wounds. They recovered videotape from security cameras in nearby businesses that captured the incident and showed the suspects leaving the scene in a white SUV. Four 9-millimeter shell casings were recovered from the scene. Soto did not survive. An autopsy confirmed Soto died from multiple gunshot wounds, including one that entered his lower back and two additional "back to front" wounds to his legs.

One of the responding officers, Officer Agustin Hernandez, was told by the owner of the beauty salon that Estrada had been with Soto when the shooting occurred and ran into the salon. Officer Hernandez spoke with Estrada and asked him if he was injured. Estrada looked "shocked" and "scared" but denied being injured.

Detective Mario Aguilar and his partner interviewed Estrada at the station after the shooting. Estrada told them Soto was known as Solo and was a member of the Colonia Watts street gang. Estrada said Soto had picked him up in a car to run an errand. They drove into downtown, parked and were walking on Central Avenue when a car pulled up next to them. Estrada told the detectives both he and Soto yelled out "Watts." The driver of

the car got out.  Estrada then heard shooting and took off running.

Detective Aguilar and his partner reviewed the surveillance video that depicted the shooting.  It showed the suspects were in a white SUV.  The driver got out first, then the rear passenger behind the driver got out, extended his arm, and started shooting in the direction of Soto and Estrada on the sidewalk.  The driver of the SUV ducked down.  The two men got back into the SUV and it sped off.  Additional videotape recovered by the officers from other security cameras showed the SUV traveling to Ortega's house a short distance away and the three men getting out and going into Ortega's home.  Officers were familiar with the home because Ortega was a known gang member.

Ortega was arrested.  Detective Aguilar had Ortega placed in a holding cell with a recording device and an informant.  Ortega and the informant eventually started talking.

Detective Aguilar interviewed Ortega after listening to the holding cell conversation.  Ortega expressed concern about talking to the detectives, mostly fear that his family members would be retaliated against for him snitching on another gang member.  Ortega eventually identified defendant as the shooter.  Detective Aguilar believed Ortega's explanation of the incident was largely corroborated by the surveillance videotape they had recovered.

Defendant was interviewed after his arrest.  Detective Aguilar was unable to confirm many aspects of defendant's statement.  Defendant said he was working on the day of the incident, but Detective Aguilar confirmed with the alleged employer that defendant was not working for them that day.

Defendant denied being at Ortega's house, but surveillance video showed defendant at Ortega's home on multiple occasions, including the day of the incident, and showed defendant take an Uber ride from that location after the shooting.

Detective Aguilar obtained a search warrant for defendant's Facebook account. The records showed a photograph of defendant holding a handgun posted to his account the day before the shooting, as well as another post on the day of the shooting with the message "tryna to go bust." Detective Aguilar worked gang enforcement prior to becoming a homicide detective and knew that was gang terminology that meant someone was going to shoot someone, often a rival gang member.

In August 2019, the case went to trial.

Estrada, Detective Aguilar, the medical examiner, and the officers who responded to the scene testified to the above facts.

During cross-examination, Estrada was impeached on several points. Estrada testified inconsistently with what he told detectives at the police station. He denied knowing Soto had a gang moniker and said he just knew Soto as his brother's friend Everardo. Estrada also denied telling Detective Aguilar that Soto was his "big homie." He conceded he had not been cooperative with the police investigating the shooting but said it was only because he had moved to Bakersfield to get away from the gang violence in his neighborhood.

Codefendant Ortega testified for the prosecution pursuant to an immunity-leniency agreement. He admitted lying to investigating officers about many facts. He acknowledged he was in custody because of the shooting and was testifying pursuant to a leniency agreement in exchange for pleading guilty to being an accessory after the fact and admitting the gang allegation.

5

Ortega admitted his membership in KMT, a clique of the South Side Watts street gang. KMT stood for Krazy Mexican Town. Ortega said his gang moniker was Dodger. Ortega acknowledged having suffered several prior convictions, including for vandalism and felony gun possession. He said he had known codefendant Moreno since they were children, and he had known defendant for several years. Both Moreno and defendant were also members of the KMT gang. Defendant's gang moniker is Boxer. Moreno's gang moniker is Chucky, and in 2018, Moreno drove a white SUV.

Ortega testified he was with defendant and Moreno on the morning of June 22, 2018. They were on their way to a funeral. Moreno was driving, Ortega was in the front passenger seat, and defendant was seated behind Moreno. As they were slowing down to stop at a signal, they saw two guys walking on the sidewalk. Moreno pointed them out and asked Ortega if he thought they were from "Fifth and Hill," another street gang in the area. Moreno stopped the SUV and Ortega called out through the front passenger window, "where you fools from?"

Ortega said the older of the two men answered back "Watts" and then said "Colonia." Colonia Watts was another rival gang of KMT. Both Moreno and defendant had been shot in the past by members of the Colonia Watts gang. Ortega heard defendant yell out "KMT" from the back seat. Ortega thought they would get out and beat up the two guys, since it was three against two. He started to unbuckle his seat belt to get out when he heard gunshots. Everything happened very fast. Moreno and defendant were already out of the SUV. Without getting out of the car, Ortega saw one of the two guys lying on the sidewalk. Ortega realized it was defendant who had been shooting after

defendant jumped back into the SUV with Moreno. They immediately drove to Ortega's house a short distance away.

Ortega confirmed surveillance videotape showing Moreno's SUV coming to a stop next to Estrada and Soto, Soto exchanging words with him, and defendant shooting at Estrada and Soto. He said that as they fled the scene, the three of them were yelling inside the SUV. Ortega said "it should not have happened . . . . It was wrong place, wrong time."

Once they got back to Ortega's house, Ortega changed clothes, and he and Moreno went to the funeral. Defendant did not go with them because Moreno did not want defendant back in his car. Ortega confirmed video footage from security cameras on his house showing defendant leaving his house, walking across the street, and eventually being picked up by another car.

Ortega denied having a gun with him that day and denied knowing defendant had brought one with him. Ortega said there was never any discussion or plan to go out and shoot that day, reiterating they were headed to a funeral. Ortega said several days later, defendant told him he shot at Soto and Estrada because they were rival gang members, and he had been shot by members of that gang before. Defendant told Ortega he had gotten rid of the gun.

On cross-examination, Ortega admitted he initially lied to the investigating officers about numerous facts. He denied being present; he said Estrada and Soto initiated the contact by yelling out to him, when in fact, he was the one who "bang[ed]" on them; he said both Estrada and Soto yelled out "Watts," when in fact, only the older one (Soto) yelled out a response; he denied knowing defendant's first name or that he knew him very well, although he had known defendant for years; and he said only defendant

7

got out of the SUV, even though Moreno got out with him, because he wanted to protect Moreno.

Ortega testified Soto raised his shirt up when defendant and Moreno got out of the SUV, but he did not recall seeing anything in Soto's hands, and he never saw Soto with a weapon. Ortega said he was in fear for his life when the shooting started because he was not sure where it was coming from.

Ortega denied disliking defendant or that his trial testimony was revenge for defendant flirting with his girlfriend. He said that if gang members think another gang member acted out of line, they have their own way of disciplining that individual. Ortega said he did not immediately tell the truth about what happened because he did not want to be a snitch and put himself and his family at risk of being harmed.

Evidence was presented from several officers about the KMT gang, including Detective Hebert Ybanez who testified as the prosecution's gang expert. It was generally known that South Side Watts KMT and the Colonia Watts gang feuded and were regularly confrontational.

Defendant testified and admitted his membership in KMT. He said he had known codefendants Ortega and Moreno for five years and they were both members of KMT. One of his gang tattoos is three dots meaning "my crazy life," and one cannot get that tattoo without being a member of the gang.

Defendant said that on the morning of June 22, 2018, he, Ortega and Moreno were on their way to a funeral. Moreno was driving, defendant was seated behind Moreno, and Ortega was in the front passenger seat. Defendant denied having any intention of shooting anyone that day. Defendant admitted that prior to the shooting he sent a text to a girl he liked that said "tryna go

bust," which normally means you are going out to shoot someone, but he said he was only trying to impress the girl.

Defendant admitted he had a gun in his waistband, but it was only for protection because they were headed to a funeral for another gang member. When they saw Soto and Estrada walking down the street, Moreno pulled over and Ortega yelled out to them, asking where they were from. They did not answer at first, but after Ortega asked a second time, they both responded "Colonia Watts," a rival gang.

Defendant said he was scared when he heard Colonia Watts because he had been shot a couple of years before by a member of that gang. Moreno got out of the car, and defendant got out with him. Defendant saw Soto reach under his shirt, and he believed Soto was grabbing for a gun. Defendant saw a small black object in Soto's hand. He feared getting shot, so he fired four times in Soto's direction. Defendant said he did not shoot at Estrada because he did not believe Estrada was a threat. He and Moreno then immediately got back into the car and they drove off.

Defendant admitted he lied to the investigating detectives who interviewed him after his arrest, because he was a gang member, and he did not think they would believe him about what happened.

The jury found defendant guilty as charged.

The court sentenced defendant to 40 years to life on count 1 (15 to life on the murder charge and a consecutive 25 to life for the firearm use enhancement, § 12022.53, subd. (d)). The court imposed a concurrent 10-year determinate term on count 2.

This appeal followed.

9

## DISCUSSION

### 1. The Trial Court Did Not Commit Error in Excluding the Proffered Impeachment.

Defendant contends the court committed error during the testimony of prosecution witness Maximiliano Estrada, who was walking with Soto just before Soto was shot and killed.

During cross-examination of Estrada, the court and counsel discussed a few matters outside the presence of the jury, including the fact Estrada had an open misdemeanor case for a violation of Health and Safety Code section 11377 (possession of methamphetamine). When cross-examination resumed, defense counsel asked Estrada about marijuana use, and he admitted he smoked marijuana but denied using other drugs. In response to a follow-up question, Estrada specifically denied using or ever being "caught with methamphetamines."

Defense counsel asked for a sidebar. The prosecutor said "[j]ust ask. I'm not going [to] object." The court asked counsel to approach and said, "[y]ou know better [than] to ask about a case that is pending. You know you need him to have an attorney." Defense counsel said it was relevant to Estrada's credibility. The court did not think the testimony was admissible. Defense counsel responded, "I'll move on then," and did not pursue the matter further.

Defendant now contends on appeal he should have been permitted to inquire about the pending case to show that Estrada was lying about never having been caught with methamphetamines in his possession. Defendant says he was not planning to inquire further about the facts of that open case. Defendant says the prosecutor did not oppose the question being asked, and it was important impeachment that would

10

demonstrate Estrada's willingness to lie to the jury. Defendant contends the preclusion of this evidence violated his Sixth Amendment rights to present a defense and to confront the witnesses against him. We do not agree.

" '[T]he federal Constitution guarantees an opportunity for effective cross-examination, not a cross-examination that is as effective as a defendant might prefer.' [Citations.]" (*People v. Homick* (2012) 55 Cal.4th 816, 861.) While wide latitude should ordinarily be given to cross-examination intended to test the credibility of prosecution witnesses in a criminal case, the trial court nonetheless retains broad discretion to restrict " 'cross-examination which is repetitive or only marginally relevant. [Citation.] There is no Sixth Amendment violation at all unless the prohibited cross-examination might reasonably have produced "a significantly different impression of [the witness's] credibility. . . ." [Citation.]' " (*People v. Belmontes* (1988) 45 Cal.3d 744, 780 (*Belmontes*), overruled in part on other grounds in *People v. Cortez* (2016) 63 Cal.4th 101, 118.)

Whether or not Estrada lied about being arrested for possession of methamphetamine was collateral and irrelevant to the murder charge against defendant. Our Supreme Court has said the trial court has broad discretion to exclude such impeachment under Evidence Code section 352 in order to "prevent criminal trials from degenerating into nitpicking wars of attrition over collateral credibility issues." (*People v. Wheeler* (1992) 4 Cal.4th 284, 296 (*Wheeler*); see also *People v. Jennings* (1991) 53 Cal.3d 334, 372 [no infringement on the defendant's Sixth Amendment rights where excluded evidence would have impeached "witnesses on collateral matters and was only slightly probative of their veracity"].)

11

The proffered impeachment pertained to a misdemeanor charge for drug possession only, which is not a crime of moral turpitude. (*People v. Castro* (1985) 38 Cal.3d 301, 317; *People v. Vera* (1999) 69 Cal.App.4th 1100, 1103.) Moreover, the misdemeanor charge was pending, and Estrada had not been convicted. "Additional considerations apply when the proffered impeachment evidence is misconduct *other than a prior conviction*. This is because such misconduct generally is less probative of immoral character or dishonesty and may involve problems involving proof, unfair surprise, and the evaluation of moral turpitude." (*People v. Clark* (2011) 52 Cal.4th 856, 931–932, italics added; accord, *Wheeler*, *supra*, 4 Cal.4th at pp. 296–297.)

Defense counsel effectively impeached Estrada on cross-examination, by exposing significant inconsistencies in his testimony as compared to his initial interview with Detective Aguilar. There is no reason to think the jury would have had a "significantly different impression" of Estrada had it heard he was facing a pending misdemeanor charge for possession of methamphetamines. (*Belmontes*, *supra*, 45 Cal.3d at p. 780.) Nor is there reason to believe defendant would have obtained a better outcome at trial.

## 2. The Instructional Error Was Harmless.

Defendant contends the trial court erred by failing to sua sponte instruct the jury with either CALCRIM No. 334 or CALCRIM No. 335 regarding accomplice testimony. Defendant says the failure of the court to inform the jury that it must view codefendant Ortega's testimony with caution was prejudicial and violated his right to due process and a fair trial.

We agree the court should have given the jury one of those instructions but find the instructional error was harmless by any standard. "A trial court's failure to instruct on accomplice liability under [Penal Code] section 1111 is harmless if there is 'sufficient corroborating evidence in the record.'" (*People v. Avila* (2006) 38 Cal.4th 491, 562; accord, *People v. Manibusan* (2013) 58 Cal.4th 40, 95 (*Manibusan*); *People v. Williams* (2010) 49 Cal.4th 405, 456; & *People v. Battle* (2011) 198 Cal.App.4th 50, 68.)

The record contains ample corroborating evidence. " 'Corroborating evidence may be slight, entirely circumstantial, and entitled to little consideration when standing alone. [Citations.] It need not be sufficient to establish every element of the charged offense or to establish the precise facts to which the accomplice testified. [Citations.] It is "sufficient if it tends to connect the defendant with the crime in such a way as to satisfy the jury that the accomplice is telling the truth." [Citation.]' " (*Manibusan, supra,* 58 Cal.4th at p. 95; accord, *People v. Williams* (1997) 16 Cal.4th 635, 680–681.)

Defendant's own testimony, without more, was sufficient to corroborate Ortega. Defendant admitted he fired four shots at Soto. (*People v. Williams, supra,* 16 Cal.4th at p. 680 ["The necessary corroborative evidence for accomplice testimony can be a defendant's own admissions."].)

In light of defendant's admissions, the only material issue in contention was whether defendant shot in self-defense or shot without provocation. Despite defendant's argument to the contrary, there was sufficient corroboration, independent of Ortega's testimony, that he did not act in self-defense.

There was videotape of the incident substantially consistent with Ortega's version of the shooting. The medical examiner testified that Soto suffered three gunshot wounds, all of which were "back to front," suggesting Soto was turned or turning away from defendant at the time he was shot, not facing and threatening defendant. There was no evidence that a gun was recovered from the vicinity of Soto's body or that he had been armed at the time. Detective Aguilar testified that defendant had posted, on his Facebook page, photographs holding a handgun along with slang terms indicating he was going out to shoot someone within 24 hours of the shooting.

Moreover, Ortega admitted during his testimony he had been charged in the shooting and was testifying pursuant to an immunity agreement. Defense counsel was able to elicit several inconsistencies in Ortega's pretrial interviews and trial testimony and obtain admissions from Ortega that he had in fact lied to the police on several matters before agreeing to talk to them and accept a deal. The jury would have been inclined to view Ortega's testimony with caution even in the absence of the instruction. (*People v. Williams*, *supra,* 49 Cal.4th at p. 456 [failure to instruct on accomplice testimony harmless where there was sufficient corroboration and evidence jury would have viewed accomplice's testimony pursuant to an immunity agreement with caution].)

## 3. There Was No Cumulative Error.

Finally, defendant urges us to find cumulative error, arguing the two trial errors combined to undercut his defense because they cloaked the two main prosecution witnesses (Estrada and Ortega) with a false aura of credibility.

We are not persuaded.  As we already explained, we conclude there was no evidentiary error.  And, as for the court's instructional error, it was harmless by any standard in light of the ample corroborating evidence.  Defendant has not demonstrated trial errors that combined to render his trial fundamentally unfair.

## DISPOSITION

The judgment of conviction is affirmed.

GRIMES, Acting P. J.

WE CONCUR:

WILEY, J.

OHTA, J.[*]

---

[*]     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.